**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| ESTEBAN ALFARO-HUITRON, | § | |
| ELEAZAR GARCIA-MATA, | § | |
| JOSE ANTONIO GARCIA-MATA, | § | |
| JUAN GUZMAN, | § | |
| JOSE GERARDO JASSO, | § | |
| RAUL JASSO-CERDA, | § | |
| ENRIQUE ROJAS-TORRES, | § | |
| LAZARO ROJAS-TORRES, | § | |
| TRINIDAD SANTOYO-GARCIA, and | § | CIVIL ACTION NO. 3:14-cv-159 |
| PEDRO TAMEZ, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| WKI OUTSOURCING SOLUTIONS, LLC, | § | |
| JAIME CAMPOS, | § | |
| RIO VALLEY CHILI, INC., | § | |
| RJF FARMS, INC., | § | |
| CERVANTES ENTERPRISES, INC., and | § | JURY TRIAL DEMANDED |
| TIERRA DE DIOS FARMS, LLC, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' ORIGINAL COMPLAINT**

## I.     INTRODUCTION

Ten U.S. agricultural workers bring this action against four chile growers in southern

New Mexico and their Texas-based labor contractor and its president. The U.S. workers claim

that the growers and their agents hired them in October and November 2011 to work from late

November 2011 until early March 2012. Then suddenly the businesses canceled the work,

attributing cancelation to a longstanding drought. Plaintiffs claim that the real reason that the

businesses canceled the work was because too many U.S. workers attempted to accept the

employment, which would have precluded the businesses from importing the foreign

guestworkers whom they really sought to employ under the federal H-2A program.  Plaintiffs

wasted time and effort in preparing to work for Defendants, and were left to scramble to find

other jobs after Defendants reneged on their offer of employment.  Hence this lawsuit.

## II.   JURISDICTION

2.1   This court has jurisdiction over this action pursuant to:

     a)   28 U.S.C. § 1331 (Federal Question);

     b)   29 U.S.C. § 1854(a) (Migrant and Seasonal Agricultural Worker

          Protection Act ("AWPA"), 29 U.S.C. §§ 1801, *et seq.*); and

     c)   28 U.S.C. § 1367 (Supplemental Jurisdiction).

2.2   The Court has the power to grant declaratory relief pursuant to 28 U.S.C. §§ 2201

and 2202.

## III.   VENUE

3.1   Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial

part of the events or omissions giving rise to the claim occurred in this district, or a substantial

part of property that is the subject of the action is situated in this district.

3.2   Venue is also proper pursuant to 29 U.S.C. § 1854.

## IV.   PARTIES

4.1   The ten individual Plaintiffs—ESTEBAN ALFARO-HUITRON, ELEAZAR

GARCIA-MATA, JOSE ANTONIO GARCIA-MATA, JUAN GUZMAN, JOSE GERARDO

JASSO, RAUL JASSO-CERDA, ENRIQUE ROJAS-TORRES, LAZARO ROJAS-TORRES,

TRINIDAD SANTOYO-GARCIA, and PEDRO TAMEZ—are farmworkers.  Plaintiffs

ESTEBAN ALFARO-HUITRON, ELEAZAR GARCIA-MATA, JOSE ANTONIO GARCIA-

MATA, JUAN GUZMAN, ENRIQUE ROJAS-TORRES, and LAZARO ROJAS-TORRES

(collectively, "the El Paso Plaintiffs") have their permanent place of residence in El Paso County, Texas.  Plaintiffs JOSE GERARDO JASSO, RAUL JASSO-CERDA, TRINIDAD SANTOYO-GARCIA, and PEDRO TAMEZ (collectively, "the Valley Plaintiffs") have their permanent place of residence in Hidalgo County, Texas.

4.2     Defendant WKI OUTSOURCING SOLUTIONS, LLC ("WKI") is a Texas limited liability company doing business and with its corporate headquarters in El Paso, Texas. WKI may be served with process by serving its registered agent, Defendant JAIME CAMPOS, at 1401 Lomaland Drive, El Paso, TX 79935.

4.3     Defendant JAIME CAMPOS is the president, registered agent, and manager of Defendant WKI.

4.4     Defendant RIO VALLEY CHILI, INC. ("RIO VALLEY") is a New Mexico corporation doing business and with its corporate headquarters in Rincon, New Mexico.  RIO VALLEY may be served with process by serving its registered agent, Timothy Flynn, at 131 Saint Elaine Road, Rincon, NM 87940.

4.5     Defendant RJF FARMS, INC. ("RJF") is a New Mexico corporation doing business and with corporate headquarters in Salem, New Mexico.  RJF may be served with process by serving its registered agent, Ronnie J. Franzoy, at Highway 187 North, Salem, NM 87941.

4.6     Defendant CERVANTES ENTERPRISES, INC. ("CERVANTES") is a New Mexico corporation doing business and with corporate headquarters in Vado, New Mexico. CERVANTES may be served with process by serving its registered agent, Emma Jean Cervantes, at 101 Highway 28 Paseo Apodaca, La Mesa, NM 88044.

4.7     Defendant TIERRA DE DIOS FARMS, LLC ("TIERRA DE DIOS") is a New Mexico limited liability company doing business and with corporate headquarters in Garfield, New Mexico.  TIERRA DE DIOS may be served with process by serving its registered agent, Bernadette Holguin, at North Highway 187, Garfield, NM 87936.

## V.     STATEMENT OF FACTS

5.1     At all times relevant to this action, each of the following Defendants was an "agricultural employer" within the meaning of AWPA, 29 U.S.C. § 1802(2):

      a)      RIO VALLEY;

      b)      RJF;

      c)      CERVANTES; and

      d)      TIERRA DE DIOS.

5.2     At all times relevant to this action, each and every Plaintiff was engaged in "agricultural employment" within the meaning of AWPA, 29 U.S.C. § 1802(3).

5.3     At all times relevant to this action, WKI and JAIME CAMPOS were "farm labor contractors" within the meaning of AWPA, 29 U.S.C. § 1802(7).

5.4     At all times relevant to this action, each and every Plaintiff was a "migrant agricultural worker" within the meaning of AWPA, 29 U.S.C. § 1802(8).

5.5     At all times relevant to this action, each and every Defendant was a "person" within the meaning of AWPA, 29 U.S.C. § 1802(9).

5.6     At all times relevant to this action, each and every Plaintiff was a "United States worker" or "U.S. worker" within the meaning of 20 C.F.R. § 655.103(b).

**A.   The H-2A Application Process and Requirements**

5.7     The Immigration and Nationality Act (INA) authorizes the nation's current

agricultural guestworker program, called the H-2A program.  *See* 8 U.S.C. 1101(a)(15)(H)(ii)(a).

This program allows alien workers to be admitted temporarily into the United States to perform

agricultural labor if an insufficient number of U.S. workers[1] are able, willing, qualified, and

available for the job at the time and place needed.

5.8     The H-2A program has two fundamental goals: (1) employ U.S. workers rather

than aliens whenever possible; and (2) prevent foreign agricultural workers from adversely

affecting the wages and working conditions of U.S. workers.  *See* 8 U.S.C. § 1188(a)(1)(A)-(B).

5.9     An employer wishing to employ foreign agricultural workers must first seek able,

willing, qualified, and available U.S. workers both through the interstate clearance system

operated by State Workforce Agencies (SWAs), and through independent positive recruitment

efforts.

5.10    Employers who seek foreign guestworkers must first submit a job offer on form

ETA-790, also known as a "clearance order."  They submit this form to the SWA serving the

area of intended employment.  If the job opportunity is located in more than one state within the

same area of intended employment, then the employer may submit a clearance order to any SWA

with jurisdiction over the anticipated worksites.  20 C.F.R. § 655.130.

5.11    Clearance orders are job offers describing the terms and conditions of the job,

including the following:

        a)      An agreement to abide by the assurances required by 20 C.F.R. § 655.135;

---

[1] A "U.S. worker" is a citizen or national of the United States or an alien lawfully admitted for
permanent residence in the United States.  20 C.F.R. § 655.103.

b)      The length of the job opportunity;

c)      Certain minimum benefit, wage, and working-condition provisions

including: housing; workers' compensation; employer-provided items;

meals; transportation; a guarantee to provide three-quarters of the

promised work; record-keeping; statements of hours and earnings; the

frequency of pay; provisions regarding the abandonment of employment,

termination for cause, and contract impossibility; a copy of the work

contract; and information regarding deductions;

d)      A guarantee of the first week's wages for any worker referred through the

clearance system or by farm labor contractors;

e)      An assurance that the wages and working conditions are not less than

those among similarly-employed farmworkers in the area of intended

employment; and

f)      An assurance by the employer that the clearance order contains all the

material terms and conditions of the job.

5.12    Once the relevant SWA finds the clearance order to be acceptable, the SWA

publishes the clearance order within and outside the state to recruit U.S. workers for the

employer in the area of intended employment.  20 C.F.R. § 655.121(c).

5.13    During the SWA's and the employer's recruitment of U.S. workers, the employer

must offer at least the same working conditions, including the same wage rate, to U.S. workers as

it is offering to its prospective H-2A employees.  20 C.F.R. § 655.122(a).

5.14    After submitting the clearance order to the SWA, the employer files a temporary

labor certification application with the U.S. Department of Labor's (DOL) Employment and

Training Administration (ETA) National Processing Center in Chicago, along with a copy of the clearance order.  20 C.F.R. § 655.130(a), (b).

5.15    As part of the clearance order and the temporary labor certification application, an employer must agree to accept referrals of all qualified, available U.S. workers who apply during the first half of the contract period.  20 C.F.R. § 655.135(c).   Not only must the employer accept these referrals, it must provide employment if the workers are qualified and available.  *Id.* at (d).  This is a continuing obligation throughout the first half of the contract period.

5.16    DOL decides whether to approve or deny the employer's temporary labor certification application based on the employer's representations and whether the employer has met the certification requirements, including the obligation to recruit U.S. workers.  8 U.S.C. § 1188(b)(4).

5.17    Before DOL can approve a temporary labor certification application, the employer must file a written recruitment report with the Certifying Officer at DOL in charge of the employer's application.  20 C.F.R. § 655.156(a).  The report must:

a)      Identify all recruitment sources;

b)      Identify all U.S. workers referred for employment and the results of the referral;

c)      Confirm that all former U.S. worker employees have been contacted and by which means; and

d)      State the lawful, job-related reason for which any U.S. workers were not hired.  *Id.*

5.18    While the procedures described above are somewhat involved, agricultural employers use the H-2A program because it benefits them in many practical ways, described

next.  The H-2A guestworkers who receive visas to work in the United States are legally required to work for <u>only</u> one employer; they cannot leave their job without giving up their legal right to be present in the United States, even if their employer is violating U.S. employment laws or the H-2A regulations.  Furthermore, U.S. anti-discrimination laws do not apply beyond U.S. borders, allowing employers importing H-2A guestworkers to select their ideal workforce—usually young men willing to live away from their families, work long hours, perform difficult work, and accept low pay.  Lastly, employers are exempt from paying Social Security and unemployment taxes on H-2A workers' wages, which saves them money.  By contrast, U.S. workers are able to work for any employer they choose, allowing them to select the employer offering the best wages and conditions.  Additionally, U.S. workers are entitled to more job-related benefits, including protection by the AWPA, unemployment insurance, and employer contributions to their Social Security accounts.

**B.  The Grower Defendants Hired WKI to Provide Them with Workers, and WKI Petitioned the Federal Government for Permission to Import Foreign Workers**

5.19    The large agricultural industry in southern New Mexico has long used local U.S. agricultural labor to tend and harvest its crops.  The local agricultural labor supply has always met growers' demand for hand-harvest agricultural labor.

5.20    In late 2011, however, Defendant WKI contracted with RIO VALLEY, RJF, CERVANTES, and TIERRA DE DIOS (collectively, "the Grower Defendants") to import what would have been southern New Mexico's first group of foreign H-2A workers.

5.21    In or around September 2011, the Grower Defendants signed "Agreements of Outsourcing Support" with WKI.  *See Exhibits 1-4, attached*.  The Grower Defendants and WKI agreed to the following terms:

a)      WKI would provide RIO VALLEY with 25 workers from November 28, 2011 until February 24, 2012;

b)      WKI would provide RJF with 25 workers from November 28, 2011 until March 9, 2012;

c)      WKI would provide CERVANTES with 15 workers from November 10, 2011 until March 9, 2012; and

d)      WKI would provide TIERRA DE DIOS with 20 workers from November 28, 2011 until March 9, 2012.

5.22     At all times relevant to this action, and in all WKI's actions and omissions set forth in this Complaint, WKI acted as an agent for one or more of the Grower Defendants, and acted within the scope of its agency.

5.23     Between September 27 and November 4, 2011, Defendant JAIME CAMPOS, acting in his capacity as President of WKI and as an agent for all of the Grower Defendants, submitted an original Clearance Order and three amended Orders to DOL's ETA to request permission to import 96 foreign H-2A workers to work from November 28, 2011 until March 9, 2012 at RIO VALLEY, RJF, CERVANTES, and TIERRA DE DIOS, all in southern New Mexico.  *See Exhibit 5, attached*.

5.24     WKI sought these workers to "manually plant, cultivate, and harvest vegetables, fruits, nuts, and field crops such as green chile, red chile, onions, pumpkin, grapes, corn, cotton, and other seasonal crops," according to the Clearance Order.  WKI specified that workers' duties "may include tilling soil and applying fertilizers; transplanting, weeding, thinning, or pruning crops; applying pesticides; cleaning, packing, and loading harvest products."

5.25    The green chile season ends in late September or early October, and the red chile season lasts only until early December.

5.26    None of the other crops listed in the Clearance Order is planted, cultivated, or harvested in the late fall or winter, except for certain types of onions.

5.27    The Clearance Order listed the crops that each Grower Defendant produced, and only RIO VALLEY was listed as producing onions.

5.28    Additionally, although the Clearance Order did not require workers to have any specific experience in agricultural labor, duties such as pruning and applying pesticides require training.

5.29    WKI wrote in the Clearance Order that the workers would live in a dormitory attached to the *Un Nuevo Pacto* church on the east side of El Paso, Texas between 93 and 40 miles from the worksites in southern New Mexico.  The housing was to be provided to the workers without charge.  *See id*.

5.30    WKI also promised in the Clearance Order to provide 35 hours of work per week, with a guarantee of three-quarters of the promised work, three meals a day for workers at a cost of $10.73 per person per day, a wage of $9.71 per hour, and free transportation between the housing site and the work sites.  *See id*.

**C.  The Grower Defendants, WKI, and JAIME CAMPOS Recruited and Hired Farmworkers, Including the Valley Plaintiffs, Through Texas Workforce Solutions**

5.31    In or around mid-November 2011, Plaintiffs JOSE GERARDO JASSO, RAUL JASSO-CERDA, and TRINIDAD SANTOYO-GARCIA, learned of Defendants' job offer at their local Texas Workforce Solutions office in Mission, Texas.

5.32    The Texas Workforce Commission is the designated SWA in Texas.  Texas Workforce Solutions is a statewide network comprised of the Texas Workforce Commission, 28 workforce development boards, and their contracted service providers and community partners.

5.33    Through the SWA, Plaintiffs JOSE GERARDO JASSO, RAUL JASSO-CERDA, and TRINIDAD SANTOYO-GARCIA accepted the work offered by Defendants, on the terms of the Clearance Order that WKI filed with DOL.

5.34    In or around mid-November 2011, Texas Workforce Solutions employee Mario Galvan in the Mission, Texas office visited Plaintiff PEDRO TAMEZ at his home to inform him of Defendants' job offer.  Plaintiff PEDRO TAMEZ agreed to take the job and signed the contract that Mario Galvan provided.  Plaintiff PEDRO TAMEZ also spoke with Defendant JAIME CAMPOS on the phone from his house on that day.  JAIME CAMPOS explained the terms of the work to PEDRO TAMEZ and asked him if he was interested in the work.  PEDRO TAMEZ told JAIME CAMPOS that he was interested.  JAIME CAMPOS hired PEDRO TAMEZ and told him to be ready to travel to El Paso in late November.

5.35    On or around November 14, 2011, Texas Workforce Solutions employee Mario Galvan in the Mission, Texas office informed a representative of the Texas Workforce Commission that WKI had hired Plaintiff PEDRO TAMEZ.

5.36    Defendants' offer to the Valley Plaintiffs of work, free housing, and free transportation according to the terms outlined above, coupled with the Valley Plaintiffs' acceptance of that offer, created a "working arrangement" within the meaning of AWPA, 29 U.S.C. § 1822(c) between each and every Valley Plaintiff and each and every Defendant.

5.37    Defendants' offer of work to the Valley Plaintiffs according to the terms outlined above, and the acceptance thereof by the Valley Plaintiffs, created a contract of employment between each and every Valley Plaintiff and each and every Defendant.

5.38    The Valley Plaintiffs ceased looking for other agricultural employment because they had agreed to work for Defendants between November 28, 2011 and March 9, 2012.

5.39    At the time that Defendants provided information to the Valley Plaintiffs through Texas Workforce Solutions, WKI knew that the information it was providing about the terms and conditions of the work and housing was false and misleading.

5.40    In the alternative, at the time that Defendants provided information to the Valley Plaintiffs, Defendants made those promises to each of these Plaintiffs recklessly, presenting them as certainties, when WKI had no knowledge of their truth.

**D.  The Grower Defendants, WKI, and JAIME CAMPOS Recruited and Hired Farmworkers, Including Plaintiffs ESTEBAN ALFARO-HUITRON, ELEAZAR GARCIA-MATA, JOSE ANTONIO GARCIA-MATA, JUAN GUZMAN, ENRIQUE ROJAS-TORRES, and LAZARO ROJAS-TORRES, in Person in El Paso, Texas**

5.41    In or around mid-November, 2011, JAIME CAMPOS and an unknown number of assistants held a number of meetings at the Border Agricultural Workers' Center ("BAWC") near downtown El Paso, Texas in order to recruit, solicit, hire, employ, furnish, transport, and/or house farmworkers for employment on behalf of WKI and the Grower Defendants.

5.42    At all times relevant to this action, and in all Defendants' actions and omissions set forth in this Complaint, these assistants acted as agents for WKI, Campos, and the Grower Defendants, and acted within the scope of their agency.

5.43    On information and belief, at all times relevant to this Complaint, these assistants were not licensed by the U.S. Department of Labor to recruit migrant farmworkers.

5.44    At these meetings, either JAIME CAMPOS or his assistant(s) described the details of the job offer, asked interested workers to sign up on a list, asked interested workers to fill out a job application, interviewed interested workers, and had interested workers sign contracts.

5.45    Each of the El Paso Plaintiffs was present for at least one of these meetings.

5.46    Most or all of the El Paso Plaintiffs wrote his name on the list of interested workers that JAIME CAMPOS or his assistant(s) circulated.

5.47    Most or all of the El Paso Plaintiffs filled out an application for the offered job and turned them in to WKI by giving them to JAIME CAMPOS or his assistant(s).

5.48    Most or all of the El Paso Plaintiffs signed a contract provided by JAIME CAMPOS or his assistant(s) to accept the offered job.

5.49    JAIME CAMPOS or his assistant(s) gave some workers, including Plaintiffs ELEAZAR GARCIA-MATA and JUAN GUZMAN, paper copies of the Clearance Order that he filed with the U.S. Department of Labor.

5.50    At one or more meetings held at the BAWC in El Paso, JAIME CAMPOS or his assistant(s) described to the assembled farmworkers the basic details of the job offer contained in the Clearance Order.  JAIME CAMPOS or his assistant)s) told a number of the El Paso Plaintiffs that the work was certain, and that there was more than three months' worth of work available, up to five or six months' worth of work.

5.51    Various farmworkers, including the El Paso Plaintiffs, accepted the offer made by Defendants directly or by their agent(s) at the time of recruitment in El Paso in or around mid-November 2011, and agreed to work for Defendants under the terms of the Clearance Order for the consideration offered by Defendants.

5.52    Defendants' offer to the El Paso Plaintiffs of work, housing, and transportation according to the terms outlined above, coupled with the El Paso Plaintiffs' acceptance of that offer, created a "working arrangement" within the meaning of AWPA, 29 U.S.C. § 1822(c) between each and every El Paso Plaintiff and each and every Defendant.

5.53    Defendants' offer of work to the El Paso Plaintiffs according to the terms outlined above, and the acceptance thereof by the El Paso Plaintiffs, created a contract of employment between each and every El Paso Plaintiff and each and every Defendant.

5.54    The El Paso Plaintiffs ceased looking for other agricultural employment because they had agreed to work for Defendants between November 28, 2011 and March 9, 2012 (and some had agreed to work for up to five or six months).  Some of the El Paso Plaintiffs left other jobs in order to accept the job offered by Defendants.

### E.  WKI Refused to Interview Qualified U.S. Workers, Despite the Fact that New Mexico and Texas SWAs Each Referred Over 100 Workers for the Job

5.55    Texas and New Mexico workers expressed a high level of interest in Defendants' job offer, just as they had with similar offers for decades.  *See Exhibit 6, attached* (e-mail stating that "62 readily available farm workers attend[ed] [a meeting at the BAWC] from the El Paso, Texas area"), *Exhibit 7, attached* (e-mail stating that New Mexico referred 104 workers to this job, and Texas referred 105).

5.56    An employer recruiting U.S. workers under the H-2A regulations must hire all U.S. workers who possess the minimum qualifications for the job.  *See* 8 U.S.C. § 1188(c)(3)(A)(ii); 20 C.F.R. § 655.122(b).

5.57    Defendant JAIME CAMPOS told employees of Texas Workforce Solutions that he wanted to select and screen the U.S. workers who were applying for the job, so that he could

hire the "best" workers, despite the fact that the Clearance Order specified that no experience was necessary for this job.  *See Exhibit 8, attached.*

5.58     On information and belief, Campos deterred and dissuaded U.S. workers from this job by refusing to interview qualified and willing U.S. workers, and by requiring them to submit resumes (when the Clearance Order did not require the submission of a resume).

### F.  Grower Defendants and WKI Requested Termination of the Job Order Due to Drought, Which DOL Granted

5.59     On or around November 22, 2011, JAIME CAMPOS contacted Ann Armijo at the New Mexico Department of Workforce Development via e-mail to tell her that "the farmers . . . are in a situation where the weather and the drought that affected the area is not letting them contract for the moment but they are asking us to hold it because they know starting [*sic*] the year they will have the need of more hands."  *See Exhibit 9, attached.*  JAIME CAMPOS also told Ms. Armijo that he was hoping to hire workers to take them to other states for agricultural employment.

5.60     There was no sudden drought in southern New Mexico in the Fall of 2011.  In addition, chiles benefit from a lack of rain, because rain promotes chile disease.

5.61     On or around November 24, 2011, JAIME CAMPOS requested a postponement of the approved clearance order from DOL's ETA.  *See Exhibit 10, attached.*

5.62     On or around December 1, 2011, DOL granted the requested termination "due to Contract Impossibility."  *See Exhibit 11, attached.*

### G.  The Grower Defendants, WKI, and JAIME CAMPOS Never Provided the Promised Work in Southern New Mexico, Leaving the El Paso Plaintiffs Without Contracted-For Employment and Wages

5.63     At a final meeting at the BAWC, in or around late November 2011, JAIME CAMPOS or his assistant(s) informed the workers who had accepted their job offer that they

should be ready to start work the next day.  Most or all of the El Paso Plaintiffs were present at that meeting.

5.64     That evening, after the meeting, the El Paso Plaintiffs prepared themselves to leave for work the next morning and packed their bags.

5.65     The next morning, the El Paso Plaintiffs and various other farmworkers were ready to leave for work with Defendants.  They waited at the BAWC for WKI to pick them up and transport them to the job site, as promised.  No one from WKI ever arrived at the BAWC that day to transport the workers, or any day after that.

5.66     The El Paso Plaintiffs had difficulty obtaining other work after Defendants unilaterally breached their contract to employ them.  Some were out of work for the duration of the time of the job offered by the Defendants, *i.e.* until early March, despite their concerted efforts to secure employment.  The jobs that the El Paso Plaintiffs eventually found paid less than the job that they accepted from Defendants.

5.67     At the time that Defendants provided information to the El Paso Plaintiffs, Defendants knew that the information they were providing about the terms and conditions of the work was false and misleading.

5.68     In the alternative, at the time that Defendants provided information to the El Paso Plaintiffs, Defendants made those promises to each of these Plaintiffs recklessly, as positive assertions, and without knowledge of their truth.

### H. The Grower Defendants, WKI, and JAIME CAMPOS Canceled the Promised Work in Southern New Mexico, Leaving the Valley Plaintiffs Without Contracted-For Employment and Wages

5.69     On or around November 28, 2011, JAIME CAMPOS contacted Plaintiff TRINIDAD SANTOYO-GARCIA to breach the employment contract between them.  JAIME

CAMPOS informed Plaintiff TRINIDAD SANTOYO-GARCIA that there was no work because bad weather had ruined the crop.

5.70    Approximately a few days after the planned start date of the employment contract, Texas Workforce Solutions employee Mario Galvan contacted Plaintiffs JOSE GERARDO JASSO and RAUL JASSO-CERDA to inform them that WKI had canceled the job.

5.71    Plaintiff PEDRO TAMEZ attempted multiple times to call JAIME CAMPOS to find out details about transportation from the Rio Grande Valley to El Paso.  JAIME CAMPOS never answered PEDRO TAMEZ's calls, and never returned his calls either.

5.72    Approximately a few days after the planned start date of his employment contract, Plaintiff PEDRO TAMEZ concluded that JAIME CAMPOS was not going to fulfill his part of their employment contract and was not going to provide the work that he had promised to provide.  No Defendant ever contacted PEDRO TAMEZ to inform him that the work was canceled.

5.73    The Valley Plaintiffs had difficulty obtaining other work after WKI unilaterally breached its contract to employ them. Some were out of work for more than a month, despite their concerted efforts to secure employment. The jobs that the Valley Plaintiffs eventually found paid less than the job that they accepted from Defendants.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION: MIGRANT AND SEASONAL AGRICULTURAL WORKER'S PROTECTION ACT (AWPA)
### (Against All Defendants)

6.1    Plaintiffs reincorporate and reallege each of the foregoing paragraphs of this Complaint as if fully set forth herein.

6.2    Defendants intentionally violated the Plaintiffs' rights under the AWPA by:

a)    Knowingly providing false and misleading information to the Plaintiffs regarding the terms and conditions of agricultural employment, in violation of 29 U.S.C. § 1821(f); and

b)    Violating without justification the terms of the "working arrangement" made with Plaintiffs, in violation of 29 U.S.C. § 1822(c).

6.3    Defendants intentionally violated the El Paso Plaintiffs' rights under the AWPA by:

a)    Allowing recruitment by employees who do not possess an FLC registration certificate, issued by the United States Department of Labor, in full force and effect, in violation of 29 U.S.C. § 1811.

6.4    Defendants also intentionally violated Plaintiff ENRIQUE ROJAS-TORRES's rights under the AWPA by:

a)    Failing to disclose to the Plaintiffs at the time of recruitment, in writing, the terms and conditions of employment, in violation of 29 U.S.C. § 1821(a); and

b)    Failing to provide to each Plaintiff the required written disclosures in a language that he could understand (namely, Spanish) at the time of recruitment, in violation of 29 U.S.C. § 1821(g).

6.5    As a direct consequence of Defendants' violations of Plaintiffs' rights under the AWPA, Plaintiffs suffered substantial injury.

6.6    Defendants are liable jointly and severally to Plaintiffs under AWPA for Plaintiffs' actual damages, or in the alternative for statutory damages of up to $500 per worker per violation of AWPA, whichever is greater, pursuant to 29 U.S.C. § 1854.

## SECOND CAUSE OF ACTION: BREACH OF CONTRACT
### (Against All Defendants)

6.7      Plaintiffs reincorporate and reallege each of the foregoing paragraphs of this Complaint as if fully set forth herein.

6.8      In or around mid-October 2011 Defendants, either directly or by their agent(s), offered employment from November 28, 2011 until March 9, 2012 to the Valley Plaintiffs when those Plaintiffs were recruited and/or solicited in Mission, Texas.

6.9      Defendants' offer was supported by consideration in that Defendants, either directly or by their agent(s), promised to hire and employ the Valley Plaintiffs from November 28, 2011 until March 9, 2012 in agricultural employment in chiles, alfalfa, onions, and cotton for a wage of $9.71 per hour with free housing and transportation, meals provided at a cost of $10.73 per worker per day, and at least 35 hours per week of work, with a guarantee of three-quarters of the promised work.

6.10     The Valley Plaintiffs accepted Defendants' offer by signing employment documents provided by the Texas Workforce Solutions office in Mission, Texas.

6.11     This created a valid and enforceable contract between Defendants and the Valley Plaintiffs.

6.12     In or around mid-November 2011 Defendants, either directly or by their agent(s), offered employment from November 28, 2011 until March 9, 2012 to the El Paso Plaintiffs (and for longer periods of time, to some) when those Plaintiffs were recruited and/or solicited in El Paso, Texas.

6.13     Defendants' offer was supported by consideration in that Defendants, either directly or by their agent(s), promised to hire and employ the El Paso Plaintiffs from November 28, 2011 until March 9, 2012 (and for longer periods of time, for some) in various types of

agricultural employment for a wage of $9.71 per hour with free housing and transportation, meals provided at a cost of $10.73 per worker per day, and at least 35 hours per week of work, with a guarantee of three-quarters of the promised work.

6.14    The El Paso Plaintiffs accepted Defendants' offer by signing their names on a list of interested workers, and/or by filling out job applications, and/or by signing contracts provided by Defendants at the time of their recruitment and/or solicitation by Defendant WKI or its agents in El Paso, Texas.

6.15    This created a valid and enforceable contract between Defendants and the El Paso Plaintiffs.

6.16    Each Plaintiff, at all relevant times, was ready, willing, and able to perform his duties under the contract with Defendants.

6.17    Each Defendant breached the contract of employment into which they entered with each Plaintiff by failing to provide the contracted-for employment and wages to each Plaintiff.

6.18    Defendants' breach was material.

6.19    As a direct consequence of Defendants' breach of the employment contract, the Plaintiffs suffered damages and substantial injuries.

6.20    The damages of each Plaintiff, including, but not limited to, injuries and lost wages, were incurred as natural, probable, and foreseeable consequences of Defendants' above-described material breaches of their contract with each Plaintiff.

6.21    Defendants are therefore liable jointly and severally to each Plaintiff for actual, incidental, and consequential damages, and costs under TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (Vernon 2012).

## THIRD CAUSE OF ACTION: PROMISSORY ESTOPPEL
### (Against All Defendants)

6.22    Plaintiffs reincorporate and reallege each of the foregoing paragraphs of this Complaint as if fully set forth herein.

6.23    Acting in reasonable and detrimental reliance on Defendants' promises, either directly or by their agent(s), to provide them with the promised work in agricultural labor from November 28, 2011 until March 9, 2012, with free housing and transportation, at least 35 hours per week of work, and a wage of $9.71 per hour, with a guarantee of three-quarters of the promised work, the Valley Plaintiffs stopped looking for other work for that period and began making plans to travel to the El Paso area to begin work.

6.24    Acting in reasonable and detrimental reliance on Defendants' promises, either directly or by their agent(s), to provide them with the promised work in agricultural labor from November 28, 2011 until March 9, 2012 (and for longer periods of time, for some), with free housing and transportation, at least 35 hours per week of work, and a wage of $9.71 per hour, with a guarantee of three-quarters of the promised work, the El Paso Plaintiffs left their employment with other employers and prepared their belongings and personal effects in order to travel to the promised housing complex and begin working for Defendant WKI.

6.25    All Plaintiffs incurred expenses and forewent other opportunities because of their reliance on Defendants' promises, which was to the farmworker Plaintiffs' detriment.

6.26    Plaintiffs' performance served to benefit Defendants.

6.27    Defendants intentionally, either directly or by their agent(s), designed their promises regarding the terms and conditions of the employment arrangement to induce or tacitly encourage the Plaintiffs to reasonably rely on those promises, and to act thereon to their detriment.

6.28     The Plaintiffs' conduct in reliance on Defendants' promises was at all times known to Defendants.

6.29     Plaintiffs are therefore entitled to recover from Defendants jointly and severally *in quantum meruit*, to compensate the Plaintiffs for services provided and to avoid the unjust enrichment of Defendants.

## VII.     PRAYER FOR RELIEF

7.1     WHEREFORE, Plaintiffs respectfully request that this Court grant them the following relief:

 a) Enter a declaratory judgment that Defendants violated Plaintiffs' rights under the AWPA; and that Defendants breached each individual contract with each Plaintiff or, in the alternative, that Defendants are liable to each Plaintiff based on Plaintiffs' promissory estoppel claim as set forth in the preceding paragraphs;

 b) For each AWPA violation by Defendants, award each Plaintiff statutory damages of $500 per violation or, in the alternative, actual damages for each violation, whichever is greater, pursuant to 29 U.S.C. § 1854;

 c) Award Plaintiffs their actual, incidental, and consequential damages resulting from Defendants' breach of contract, and attorney's fees, reasonable expenses, and costs of court; or, in the alternative,

 d) Award Plaintiffs their damages resulting from their reasonable and detrimental reliance on Defendants' promises, and attorney's fees, reasonable expenses, and costs of court;

 e) Award Plaintiffs prejudgment and post-judgment interest, as allowed by law; and

 f) Award Plaintiffs all other relief as this Court deems just and proper.

Respectfully submitted,

TEXAS RIOGRANDE LEGAL AID, INC.
1331 Texas Ave.
El Paso, TX 79901
Telephone: (915) 585-5100
Fax: (915) 544-3789

*/s/ Sarah Rich*
Sarah M. Rich
Texas Bar No. 24085551
Admitted to W.D. Tex.
Email: srich@trla.org
ATTORNEY IN CHARGE FOR
PLAINTIFFS

*/s/ Jerome Wesevich*
Jerome Wesevich
Texas Bar No. 21193250
Admitted to W.D. Tex.
Email: jwesevich@trla.org
ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that I will serve process on each Defendant pursuant to the Federal Rules of Civil Procedure, and that I filed the original with the Clerk of Court via online filing with the DCECF system on this the 30th day of April, 2014.

*/s/ Sarah Rich*_____
Sarah M. Rich, Esq.