# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| ESTEBAN ALFARO-HUITRON, | § | |
| ELEAZAR GARCIA-MATA, | § | |
| JOSE ANTONIO GARCIA-MATA, | § | |
| JUAN GUZMAN, | § | |
| JOSE GERARDO JASSO, | § | |
| RAUL JASSO-CERDA, | § | |
| ISMAEL MARTINEZ-GONZALEZ | § | |
| ENRIQUE ROJAS-TORRES, | § | |
| LAZARO ROJAS-TORRES, | § | |
| TRINIDAD SANTOYO-GARCIA, | § | |
| PEDRO TAMEZ, | § | |
| ANGELA TREJO, | § | |
| EFRAIN TREJO, | § | |
| SANTOS TREJO, and | § | |
| YANETH TREJO, | § | |
|     Plaintiffs, | § | |
| | § | No. 2:15-210  CG/WPL |
| v. | § | |
| | § | Civil Action |
| WKI OUTSOURCING SOLUTIONS, LLC, | § | |
| JAIME CAMPOS, | § | |
| CERVANTES AGRIBUSINESS, | § | |
| CERVANTES ENTERPRISES, INC., | § | |
| RJF FARMS, INC., | § | |
| RONNIE J. FRANZOY, | § | |
| TIERRA DE DIOS FARMS, LLC, | § | |
| LACK FARMS, INC., and | § | |
| SKYLINE PRODUCE, LLC, | § | |
|     Defendants. | § | |

## FIRST AMENDED COMPLAINT

As the Court ordered in Doc. 102, Plaintiffs hereby amend their complaint as follows:

## JURISDICTION

1.      This court has jurisdiction over this action pursuant to:

     a.  28 U.S.C. § 1331 (Federal Question);

     b.  28 U.S.C. § 1337 (Interstate Commerce);

     c.  29 U.S.C. § 1854(a) (Migrant and Seasonal Agricultural Worker Protection Act

(AWPA), 29 U.S.C. §§ 1801, *et seq.*); and

     d.  28 U.S.C. § 1367 (Supplemental Jurisdiction).

## VENUE

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2).

## PARTIES

3.      Seven Plaintiffs are individuals who have their permanent places of residence in El Paso,

County, Texas: ESTEBAN ALFARO-HUITRON, ELEAZAR GARCIA-MATA, JOSE

ANTONIO GARCIA-MATA, JUAN GUZMAN, ISMAEL MARTINEZ-GONZALEZ,

ENRIQUE ROJAS-TORRES, and LAZARO ROJAS-TORRES.

4.      Eight additional Plaintiffs are individuals who have their permanent places of residence

in Hidalgo County, Texas: JOSE GERARDO JASSO, RAUL JASSO-CERDA, TRINIDAD

SANTOYO-GARCIA, PEDRO TAMEZ, SANTOS TREJO, ANGELA TREJO, EFRAIN

TREJO, and YANETH TREJO.

5.      Defendant WKI OUTSOURCING SOLUTIONS, LLC (WKI) is a Texas limited liability

company doing business and with its corporate headquarters in El Paso, Texas.  WKI may be

served with process by serving its registered agent, Defendant JAIME CAMPOS, at 1401

Lomaland Drive, El Paso, TX 79935.

6.      Defendant JAIME CAMPOS is an individual who has his permanent place of residence

in Doña Ana County, New Mexico.

7.      Defendant CERVANTES AGRIBUSINESS (CAB) is a New Mexico sole proprietorship owned by the estate of Emma Jean Cervantes.

8.      Defendant CERVANTES ENTERPRISES, INC. (CEI) is a New Mexico corporation doing business and with corporate headquarters in Vado, New Mexico.

9.      Defendant RJF FARMS, INC. (RJF) is a New Mexico corporation doing business and with corporate headquarters in Salem, New Mexico.  RJF may be served with process by serving its registered agent, Ronnie J. Franzoy, at Highway 187 North, Salem, NM 87941.

10.      Defendant RONNIE J. FRANZOY is an individual who has his permanent place of residence in Doña Ana County, New Mexico.

11.      Defendant LACK FARMS, INC. (Lack) is a New Mexico corporation doing business and with corporate headquarters in Rincon, New Mexico.  Lack may be served with process by serving its registered agent, Joe Paul Lack, Jr., at 5585 Kit Carson Road, Rincon, NM 87940.

12.      Defendant TIERRA DE DIOS FARMS, LLC (Tierra) is a New Mexico limited liability company doing business and with corporate headquarters in Garfield, New Mexico.  Tierra may be served with process by serving its registered agent, Bernadette Holguin, at North Highway 187, Garfield, NM 87936.

13.      Defendant SKYLINE PRODUCE, LLC (Skyline) is a New Mexico limited liability company doing business and with its corporate headquarters in Hatch, New Mexico.  Skyline may be served with process by serving its registered agent, Marty D. Franzoy, at 7259 Highway 26, Hatch, NM 87937.

**FACTS**

**A.      The Federal H2A Agricultural Guest Worker Program**

14.      The Immigration and Nationality Act (INA) authorizes the nation's current agricultural guest worker program, called the H2A program.  8 U.S.C. 1101(a)(15)(H)(ii)(a).  H2A allows

3

alien workers to be admitted temporarily into the United States to perform agricultural labor if an insufficient number of "U.S. workers" (citizens or lawful permanent residents) are able, willing, qualified, and available for the job at the time and place needed.  *Id.*

15.     H2A has two fundamental goals: (1) employ U.S. workers rather than aliens whenever possible; and (2) prevent foreign agricultural workers from adversely affecting the wages and working conditions of U.S. workers.  8 U.S.C. § 1188(a)(1)(A)-(B).

16.     Employers seeking H2A workers must first file U.S. Department of Labor (DOL) Form ETA-9142, an application for Temporary Employment Certification, and DOL Form ETA-790, also known as a "clearance order."   20 C.F.R. § 655.130.

17.     DOL conditionally approves each H2A application (Forms 9142 and 790) that it deems sufficient.  Conditional approval requires the H2A employer to begin recruiting U.S. workers prior to getting H2A visas for foreign workers.  During the recruitment period, employers must attempt to hire all able, willing, qualified, and available U.S. workers both through the interstate clearance system operated by State Workforce Agencies (SWAs), and through their own recruitment efforts.  8 U.S.C. § 1188(c)(3)(A)(ii); 20 C.F.R. §§ 655.122(b) and 655.135.

18.     SWAs, including the Texas Workforce Commission (TWC) and the New Mexico Department of Workforce Solutions (NM-DWS), and employers use clearance orders as job offers that describe in detail the terms and conditions of each job, including the pay rate and the commitment to hire all qualified U.S. workers.  20 C.F.R. § 655.121(c).

19.     All employers who apply to import H2A workers must include in each clearance order an offer to pay at least the Adverse Effect Wage Rate (AWER), which was $9.71 per hour in New Mexico during 2011 and $9.94 per hour in New Mexico during 2012.  20 C.F.R. § 655.122(a).

20.     If DOL deems an H2A employer's recruitment efforts to be sufficient, and if SWAs have not been able to provide the employer with a sufficient number of workers, only then does DOL

make the necessary number of H2A visas available to the employer for the period stated in the clearance order.  8 U.S.C. § 1188(b)(4); 20 C.F.R. § 655.156(a).

21.    H2A has long been a controversial program.  Workers regularly claim that DOL's lax enforcement of regulations exposes U.S. workers to the unfair competition that the statute is supposed to prohibit, and exposes foreign workers to exploitation.  One form of exploitation is when H2A employers attempt to avoid paying workers the relatively high Adverse Effect Wage Rate that is due under H2A.

22.    Prior to 2011, Southern New Mexico agricultural employers did not attempt to import H2A workers.

**B.    The Parties Prior to 2011**

23.    All fifteen Plaintiffs are U.S. citizens or lawful permanent residents, so they are all "United States workers" within the meaning of 20 C.F.R. § 655.103(b).

24.    All seven Plaintiffs domiciled in El Paso (El Paso Plaintiffs) have performed agricultural labor on farms throughout Southern New Mexico, some of them for decades.

25.    Plaintiffs are usually paid approximately the federal minimum wage for performing agricultural labor in Southern New Mexico or elsewhere, whether they are paid by the hour or paid a "piece rate" for crops they harvest.

26.    From 2009 to the present time, the federal minimum wage has always been $7.25 per hour.

27.    From 2009 to the present time, the El Paso Plaintiffs have often found insufficient work opportunities even at minimum wage.  During this period they have consistently sought more work and higher pay.

28.    The six Grower Defendants (meaning RJF, CEI, CAB, Tierra, Lack, and Skyline) are long-established Southern New Mexico businesses, meaning they have operated for well over a decade with permanent employees and they have significant assets and access to capital.

29.    The Grower Defendants all rely on seasonal labor every year to cultivate, harvest, or process chile or onion.

30.    To get the seasonal labor they need each year, the Grower Defendants all make oral contracts with various farm labor contractors, who recruit and pay workers to perform labor at the Grower Defendants' businesses.

31.    The Grower Defendants all have longstanding relationships with various farm labor contractors who supply their seasonal labor.

32.    The Grower Defendants' permanent employees supervise the quality of the work performed by their seasonal laborers and provide tools and equipment that seasonal laborers need.

33.    Over the last decade, all of the Grower Defendants have found all of the labor they need by paying at or near the federal minimum wage.

34.    Over the last decade, all of the Grower Defendants have drawn all of the seasonal labor they need from the El Paso/Las Cruces region without accessing foreign H2A workers.

35.    In December 2009, Defendant Jaime Campos incorporated Defendant WKI Outsourcing Solutions (WKI) in Texas, named himself President, and advertised WKI as "Workonnection International Human Resources Connection."

36.    Neither WKI nor Mr. Campos had any assets.

37.    Neither WKI nor Mr. Campos had any experience in recruiting any agricultural workers ever, or any training in how to do so.

38.     Neither WKI nor Mr. Campos had any experience in agriculture or supervising agricultural workers, nor any training in how to do so.

39.     Neither WKI nor Mr. Campos had any experience in accessing H2A workers, or any training in how to do so.

40.     WKI's sole purpose was to access H2A workers and make them available to Southern New Mexico growers.

41.     Mr. Campos began WKI's operations by visiting mayors throughout the Mexican state of Chihuahua and compiling a list of some two thousand Mexican nationals who would be willing to be drug-tested prior to traveling to the United States for H2A work.

42.     Mr. Campos then secured grant funding to house some three hundred H2A workers at a dormitory rented from "*El Nuevo Pacto* Church" in El Paso, Texas.

43.     On June 12, 2011, the El Paso Times published an article entitled "With Help from Agency, Mexican Laborers May Get Visas Temporarily to Work Farms in New Mexico," attached as Exhibit 1.

44.     Mr. Campos and Defendant Ronnie J. Franzoy solicited the creation and publication of attached Exhibit 1, and approve of it as an accurate statement of how and why WKI operated for profit.

**C.     2011-Defendants Hire 2011-Plaintiffs**

45.     At all relevant times, Dino Cervantes was the general manager of both Defendant Cervantes Enterprises, Inc., (CEI) and Defendant Cervantes Agribusiness (CAB), and he undertook all actions alleged below as "Cervantes" for CEI, CAB, or both.

46.     In or around September 2011, the following Defendants (2011-Defendants) spoke to one another separately or in groups to discuss WKI's business plan: RJF, Cervantes, Tierra, WKI, and Jaime Campos.

7

47.     Jaime Campos was present at each meeting with the 2011-Grower-Defendants, which include RJF, CEI, CAB, and Tierra.

48.     On September 10, 2011, Cervantes and Campos signed attached Exhibit 2, a WKI form contract entitled "Agreement of Outsourcing Support" that obligates WKI to recruit 15 workers on behalf of Cervantes and provide those workers to Cervantes from November 10, 2011 until March 9, 2012.

49.     On September 22, 2011, RJF and Campos signed attached Exhibit 3, a WKI form contract entitled "Agreement of Outsourcing Support" that obligates WKI to recruit 25 workers on behalf of RJF and provide those workers to RJF from November 28, 2011 until March 9, 2012.

50.     On September 26, 2011, Tierra and Campos signed attached Exhibit 4, a WKI form contract entitled "Agreement of Outsourcing Support" that obligates WKI to recruit 20 workers on behalf of Tierra and provide those workers to Tierra from November 28, 2011 until March 9, 2012.

51.     The 2011-Defendants also agreed to the following additional unwritten contract terms by the time they signed each Agreement of Outsourcing Support:

a.  the workers that WKI was to provide to RJF, Cervantes, and Tierra were Mexican H2A workers, and not U.S. workers;

b.  pay from each 2011-Grower-Defendant to WKI was to be each workers' hourly wage plus one dollar per wage-hour for WKI, plus the actual cost of transporting the workers from the El Paso dormitory to the New Mexico farms each day; and

c.  each workers' hourly wage was to be as low as possible.

52.     The 2011-Defendants had a meeting of the minds by which WKI was expected to:

    a.  do what was needed to import Mexican H2A workers at low enough cost to be

attractive to the 2011-Grower-Defendants;

    b.  figure out how to dissuade U.S. workers from accepting the jobs; and

    c.  get foreign workers to accept the wage they were paid without complaint.

53.    Between September 27 and November 4, 2011, Defendant JAIME CAMPOS, acting in

his capacity as President of WKI and as an agent and farm labor contractor for each 2011-

Grower-Defendant, submitted to DOL an original application for H2A workers (Form ETA-

9142, attached Exhibit 5), clearance order (Form ETA-790, attached Exhibit 6) and three

amended clearance orders, in which WKI sought permission to import foreign H2A workers to

work from November 28, 2011 until March 9, 2012 at RJF, Cervantes, and Tierra.

54.    The Forms 790 and 9142 that WKI and Mr. Campos submitted to DOL under penalty of

perjury stated:

    a.  "At this time, there are not sufficient workers who are able, willing or available at the

time and place needed to perform the farm labor and services required by [the 2011-

Grower-Defendants].  The need of the farmers is seasonal as a result of weather and

demand.  In this case, there is an immediate need for farm labor and services for this

season between November and March."

    b.  Foreign H2A workers were needed to "manually plant, cultivate, and harvest

vegetables, fruits, nuts, and field crops such as green chile, red chile, onions, pumpkin,

grapes, corn, cotton, and other seasonal crops," according to the Clearance Order. WKI

specified that workers' duties "may include tilling soil and applying fertilizers;

transplanting, weeding, thinning, or pruning crops; applying pesticides; cleaning,

packing, and loading harvest products."

c.  No qualifications or experience were necessary to perform the work needed by the 2011-Grower-Defendants.

d.  WKI would offer the jobs to U.S. workers if any applied, rather than hire foreign workers.

e.  The wage to be  paid the workers was $9.71 per hour, plus the workers were to receive free housing and transportation, and three daily meals at a cost of $10.73 per day.

f.  The workers would work 35 hours per week between November 28, 2011 and March 9, 2012.

Attached Exhibits 5 and 6.

55.     At the time that WKI and Mr. Campos made these statements to DOL under penalty of perjury, WKI and Mr. Campos knew:

a.  the 2011-Grower-Defendants had access to all of the U.S. workers they wanted, so the 2011-Grower-Defendants would only accept Mexican H2A workers from WKI;

b.  WKI had no way to make work available to any worker other than the work promised by the 2011-Grower-Defendants; and

c.  WKI did not have the 2011-Grower-Defendants' commitment to pay $9.71 per hour to foreign or U.S. workers.

56.     On November 4, 2011, DOL conditionally approved WKI's H2A application and directed WKI to begin recruiting U.S. workers, as shown in attached Exhibit 7.

57.     When WKI received DOL's conditional approval, it knew that the document attached as Exhibit 6 would be provided to U.S. workers as an offer of employment, and that the information provided in this document was false and misleading.

58.     Prior to November 4, 2011, none of the 2011-Defendants had ever received conditional approval from DOL on an H2A application, nor had they recruited U.S. workers pursuant to DOL's conditional approval.

59.     The Texas Workforce Commission (TWC) is the State Workforce Agency (SWA) designated for H2A recruitment in Texas.  Texas Workforce Solutions is a statewide network comprised of TWC and 28 local Workforce Development Boards.

60.     In mid-November 2011, four Plaintiffs domiciled in Hidalgo County (JOSE GERARDO JASSO, RAUL JASSO-CERDA, TRINIDAD SANTOYO-GARCIA, and PEDRO TAMEZ, called the 2011-Hidalgo-Plaintiffs) learned of the work terms stated in WKI's clearance order from a Texas Workforce Solutions office in Mission, Texas and from TWC employee Mario Galvan.

61.     All four 2011-Hidalgo-Plaintiffs discussed the terms of employment offered in WKI's clearance order with Texas Workforce Solutions, and decided to accept it.

62.     Texas Workforce Solutions helped all four 2011-Hidalgo-Plaintiffs sign all state and federal documents, and take all other actions necessary to accept the employment offered in WKI's clearance order.

63.     Texas Workforce Solutions forwarded all employment documents for all four 2011-Hidalgo-Plaintiffs to WKI, including proof of Plaintiffs' immigration status.

64.     During mid-November 2011, JAIME CAMPOS and his assistants held repeated meetings at the Border Agricultural Workers' Center (BAWC) near downtown El Paso, Texas to recruit, solicit, hire, employ, furnish, transport, and/or house farmworkers for employment on behalf of WKI and the 2011-Grower-Defendants.

65.     At all times relevant to this action, Mr. Campos's assistants acted as agents for WKI, Campos, and the 2011-Grower-Defendants, and acted within the scope of their agency.

66.     At all times relevant to this action, Mr. Campos's assistants were not licensed by the U.S. Department of Labor to recruit migrant farmworkers.

67.     At the mid-November BAWC meetings, Mr. Campos or his assistants described the details of the job offer described in WKI's 2011 clearance order, asked interested workers to sign up on a list, asked interested workers to complete a job application, interviewed interested workers, and had interested workers sign contracts of employment.

68.     Six Plaintiffs domiciled in El Paso (2011-El Paso-Plaintiffs) were present for at least one of the mid-November BAWC meetings held by Mr. Campos and his assistants, including PLAINTIFFS ESTEBAN ALFARO-HUITRON, ELEAZAR GARCIA-MATA, JOSE ANTONIO GARCIA-MATA, JUAN GUZMAN, ENRIQUE ROJAS-TORRES, and LAZARO ROJAS-TORRES.

69.     Mr. Campos and his assistants offered employment on the terms of WKI's 2011 clearance order to all six 2011-El Paso-Plaintiffs, and all six 2011-El Paso-Plaintiffs accepted this employment and signed all documents presented to them for doing so.

70.     Mr. Campos or his assistants gave some workers, including Plaintiffs ELEAZAR GARCIA-MATA and JUAN GUZMAN, paper copies of the Clearance Order that Mr. Campos filed with the U.S. Department of Labor describing the terms of employment.

71.     Plaintiff ENRIQUE ROJAS-TORRES accepted employment as described in WKI's 2011 clearance order, and signed the documents presented to him by WKI, but WKI did not give him a copy of the job offer or the contract that he signed.

72.     The 2011-Defendants' offers of employment to the ten 2011-Plaintiffs (including all four 2011-Hidalgo-Plaintiffs and all six 2011-El Paso-Plaintiffs) on the terms of the 2011 clearance order attached in Exhibit 6, whether made directly or through WKI, combined with each 2011-Plaintiffs' acceptance of each offer, created:

a.  a "working arrangement" within the meaning of AWPA, 29 U.S.C. § 1822(c), between each 2011-Defendant and each 2011-Plaintiff; and

b.  a contract of employment between each 2011-Defendant and each 2011-Plaintiff.

73.   All ten 2011-Plaintiffs ceased looking for other employment once they agreed to work for the 2011-Defendants between November 28, 2011 and March 9, 2012.

74.   Some 2011-Plaintiffs left other jobs in order to accept the job offered by the 2011-Defendants, largely because of the higher $9.71 wage offered by the 2011-Defendants.

**D.     2011-Defendants Cite Drought as a False Pretext to Renege on Employment Contracts With 2011-Plaintiffs**

75.   Defendant JAIME CAMPOS told employees of Texas Workforce Solutions that he wanted to select and screen the U.S. workers who were applying for the job, so that he could hire the "best" workers, despite the fact that the Clearance Order specified that no experience was necessary for any worker to accept this job.

76.   After Texas Workforce Solutions informed Mr. Campos that H2A regulations, and his own signed clearance order, required him to accept all willing and qualified U.S. workers, Mr. Campos decided to terminate his H2A application.

77.   On or around November 22, 2011, JAIME CAMPOS contacted Ann Armijo at the New Mexico Department of Workforce Development via e-mail to tell her that "the farmers . . . are in a situation where the weather and the drought that affected the area is not letting them contract for the moment but they are asking us to hold it because they know starting [sic] the year they will have the need of more hands."

78.   On November 24, 2011, Mr. Campos requested from DOL termination of his 2011 H2A application and release from his recruiting obligations due to "contract impossibility" produced by the drought that he described to Ms. Armijo on November 22, 2011.

13

79.     No sudden drought occurred in Southern New Mexico in November 2011.  Any drought was longstanding and its effects on agriculture were foreseeable to all 2011-Defendants before they contracted with one another in September 2011.

80.     Mr. Campos's statements to DOL and to NM-DWS citing drought as the reason for cancellation of WKI's 2011 H2A application were false.

81.     The 2011-Defendants sought to terminate WKI's 2011 H2A application not because of weather or drought, but because they concluded it would not succeed in allowing them to access Mexican H2A workers rather than U.S. workers.

82.     Drought and weather conditions did not have any unusual effect on the need for seasonal labor experienced by RJF, Cervantes, and Tierra between November 28, 2011 and March 9, 2012.

83.     RJF, Cervantes, and Tierra all actually hired and used seasonal labor during the period of November 28, 2011 through March 9, 2012.  They simply got this labor from their usual farm labor contractors rather than from WKI or Plaintiffs.

84.     At a final meeting at the BAWC, in or around late November 2011, JAIME CAMPOS or his assistants informed the workers who had accepted their job offer that they should be ready to start work the next day.  Most or all of the 2011-El Paso-Plaintiffs were present at that meeting.

85.     That evening, after the meeting, the 2011-El Paso-Plaintiffs prepared themselves to leave for work the next morning and packed their bags.

86.     The next morning, the 2011-El Paso-Plaintiffs and various other farmworkers were ready to leave for work with the 2011-Defendants.  These Plaintiffs waited at the BAWC for WKI to pick them up and transport them to the job site as promised.  No one from WKI ever arrived at the BAWC that day to transport the workers, or any day after that.

87.     On or about November 28, 2011, JAIME CAMPOS contacted Plaintiff TRINIDAD

SANTOYO-GARCIA to breach the employment contract between them. JAIME CAMPOS

informed Plaintiff TRINIDAD SANTOYO-GARCIA that there was no work because bad

weather had ruined the crop.

88.     Soon after November 28, 2011, Texas Workforce Solutions employee Mario Galvan

contacted Plaintiffs JOSE GERARDO JASSO and RAUL JASSO-CERDA to inform them that

WKI had canceled the job.

89.     Plaintiff PEDRO TAMEZ attempted multiple times to call JAIME CAMPOS to find out

details about how he would be transported from Hidalgo County to El Paso so he could begin

work.  JAIME CAMPOS never answered or returned PEDRO TAMEZ's many calls.

90.     The 2011-Plaintiffs had difficulty obtaining other work after the 2011-Defendants

unilaterally breached their employment contracts.  Some Plaintiffs were out of work for the

entire duration of the contract, until early March, despite their concerted efforts to secure

employment.  For those Plaintiffs that did find replacement work, the jobs that they found paid

less than the job that they accepted from the 2011-Defendants.

91.     At all times that the 2011-Defendants caused employment information to be provided to

the 2011-Plaintiffs as stated above, the 2011-Defendants knew that the information provided

about the terms and conditions of the work was false and misleading.

92.     In the alternative, at all times that the 2011-Defendants caused employment information

to be provided to the 2011-Plaintiffs, the 2011-Defendants did so recklessly, as positive

assertions, and without knowledge of whether this information was accurate.

**E.       2012-Defendants Hire 2012-Plaintiffs**

93.      In or around February 2012, the following Defendants (2012-Defendants) spoke to one another separately or in groups to discuss WKI's business plan: Ronnie J. Franzoy, Skyline, Lack, WKI, and Jaime Campos.

94.      Jaime Campos was present at each meeting with the 2012-Grower-Defendants, which include Ronnie J. Franzoy, Skyline, and Lack.

95.      On February 24, 2012, Lack and Campos signed attached Exhibit 8, a WKI form contract entitled "Agreement of Outsourcing Support" that obligates WKI to recruit 60 workers on behalf of Lack and provide those workers to Lack for onion harvest from June 1, 2012 until August 15, 2012, and again for red chile harvest from October 1, 2012 to November 15, 2012.

96.      On March 14, 2012, Mr. Campos and a person purporting to be Defendant Ronnie J. Franzoy signed attached Exhibit 9, a WKI form contract entitled "Agreement of Outsourcing Support" that obligates WKI to recruit 25 workers on behalf of Skyline and provide those workers to Skyline from June 1, 2012 until August 15, 2012.

97.      The person who signed Ronnie Franzoy's name on Exhibit 9 on March 14, 2012 was:

>       a.  Ronnie Franzoy, who had actual authority to execute the contract from his brother Marty Franzoy who manages Skyline;

>       b.  Ronnie Franzoy, who acted only for himself and his business interest in Skyline when he executed the contract; or

>       c. a person designated by Defendant Jaime Campos, who forged Ronnie Franzoy's name on the contract without authorization.

98.      The 2012-Defendants also agreed to the following additional unwritten contract terms by the time they signed each Agreement of Outsourcing Support:

a. the workers that WKI was to provide to Skyline, Ronnie J. Franzoy, and Lack were Mexican H2A workers, and not U.S. workers;

b. pay from each 2012-Grower-Defendant to WKI was to be each workers' hourly wage plus one dollar per wage-hour for WKI, plus the actual cost of transporting the workers from the El Paso dormitory to the New Mexico farms each day; and

c. each workers' hourly wage was to be as low as possible.

99.   The 2012-Defendants had a meeting of the minds by which WKI was expected to:

a. do what was needed to import Mexican H2A workers at low enough cost to be attractive to the 2012-Grower-Defendants;

b. figure out how to dissuade U.S. workers from accepting the jobs; and

c. get foreign workers to accept the wage they were paid without complaint.

100.   In late March or early April 2012, Defendant JAIME CAMPOS, acting in his capacity as President of WKI and as an agent and farm labor contractor for each 2012-Grower-Defendant, submitted to DOL an original application for H2A workers (Form ETA-9142, attached Exhibit 10) and clearance order (Form ETA-790, attached Exhibit 11), in which WKI sought permission to import 65 foreign H2A workers to work from June 1, 2012 until August 15, 2012 at Defendants SKYLINE and LACK.

101.   The Forms 790 and 9142 that WKI and Defendant CAMPOS submitted to DOL under penalty of perjury stated:

a. "At this time, there are not sufficient workers who are able, willing or available at the time and place needed to perform the farm labor and services required by [the 2012-Grower-Defendants]. The need of the farmers is seasonal as a result of weather and demand. In this case, there is an immediate need for farm labor and services for this season between June and August."

17

b.  65 foreign H2A workers were needed to "manually plant, cultivate, and harvest filed crops such as green chile, red chile, onions, and other seasonal crops."

c.  No qualifications or experience were necessary to perform the work needed by the 2012-Grower-Defendants.

d.  WKI would offer the jobs to U.S. workers if any applied, rather than hire foreign workers.

e.  The wage to be  paid the workers was $9.94 per hour, plus the workers were to receive free housing and transportation, and three daily meals at a cost of $11.13 per day.

f.  The workers would work 35 hours per week between June 1, 2012 and August 15, 2012.

Attached Exhibits 10 and 11.

102.    At the time that WKI and Mr. Campos made these statements to DOL under penalty of perjury, WKI and Mr. Campos knew:

a.  the 2012-Grower-Defendants had access to all of the U.S. workers they wanted, so the 2012-Grower-Defendants would only accept Mexican H2A workers from WKI;

b.  WKI had no way to make work available to any worker other than the work promised by the 2012-Grower-Defendants; and

c.  WKI did not have the 2012-Grower-Defendants' commitment to pay $9.94 per hour to foreign or U.S. workers.

103.    On April 24, 2012, DOL conditionally approved WKI's 2012 H2A application and directed WKI to begin recruiting U.S. workers, as shown in attached Exhibit 12.  This was WKI's second conditional approval, the first being Exhibit 7.

104.    When WKI received DOL's conditional approval, it knew that the document attached as Exhibit 11 would be provided to U.S. workers as an offer of employment, and that the information provided in this document was false and misleading.

105.    In or around late-April 2012, Defendant CAMPOS and his assistants held one or more meetings at BAWC and at WKI's office at 1401 Lomaland Dr. in El Paso, Texas to recruit, solicit, hire, employ, furnish, transport, and/or house farmworkers for employment on behalf of WKI and the 2012-Grower-Defendants.

106.    At all times relevant to this action, Mr. Campos's assistants acted as agents for WKI, Campos, and the 2012-Grower-Defendants, and acted within the scope of their agency.

107.    At all times relevant to this action, Mr. Campos's assistants were not licensed by the U.S. Department of Labor to recruit migrant farmworkers.

108.    At the late-April meetings at BAWC and 1401 Lomaland, Mr. Campos or his assistants described the details of the job offer described in WKI's 2012 clearance order, asked interested workers to sign up on a list, asked interested workers to complete a job application, interviewed interested workers, and had interested workers sign contracts of employment.

109.    Four Plaintiffs domiciled in El Paso (2012-El Paso-Plaintiffs) were present for at least one of the late-April meetings held by Mr. Campos or his assistants, including Plaintiffs ESTEBAN ALFARO-HUITRON, ELEAZAR GARCIA-MATA, JUAN GUZMAN, and ISMAEL MARTINEZ-GONZALES.

110.    Mr. Campos or his assistants offered employment on the terms of WKI's 2012 clearance order, attached Exhibit 11, to all four 2012-El Paso-Plaintiffs, and all four 2012-El Paso-Plaintiffs accepted this employment and signed all documents presented to them for doing so.

111.    Plaintiff ESTEBAN ALFARO-HUITRON accepted employment as described in WKI's 2012 clearance order, and signed the documents presented to him by WKI, but WKI did not give him a copy of the job offer or the contract that he signed.

112.    In or around early-May 2012, four Plaintiffs domiciled in Hidalgo County (the Trejo Family, including ANGELA TREJO,EFRAIN TREJO, SANTOS TREJO, and YANETH TREJO) learned of the work terms stated in WKI's clearance order from Texas Workforce Solutions employee Mario Galvan.

113.    All four members of Trejo Family discussed the terms of employment offered in WKI's clearance order with Mario Galvan of Texas Workforce Solutions, and decided to accept it.

114.    Mario Galvan helped all four members of the Trejo Family prepare all state and federal documents, and take all other actions necessary to accept the employment offered in WKI's clearance order, Exhibit 11.

115.    Texas Workforce Solutions forwarded all employment documents for all four members of the Trejo Family to WKI, including proof of these Plaintiffs' immigration status.

116.    The 2012-Defendants' offers of employment to the eight 2012-Plaintiffs (including the Trejo Family and all four 2012-El Paso-Plaintiffs) on the terms of the 2012 clearance order attached in Exhibit 11, whether made directly or through WKI, combined with each 2012-Plaintiffs' acceptance of each offer, created a:

   a.  "working arrangement" within the meaning of AWPA, 29 U.S.C. § 1822(c), between each 2012-Defendant and each 2012-Plaintiff; and

   b.  contract of employment between each 2012-Defendant and each 2012-Plaintiff.

117.    Because all eight 2012-Plaintiffs had agreed to work for the 2012-Defendants between June 1, 2012 and August 15, 2012, they all ceased seeking other employment for the period June 1, 2012 to August 15, 2012.

118.    Some 2012-Plaintiffs left other jobs in order to accept the job offered by the 2012-Defendants, largely because of the higher $9.94 wage offered by the 2012-Defendants.

**F.      2012-Defendants Cite Drought and Hail as a False Pretext to Renege on Employment Contracts With 2012-Plaintiffs**

119.    On May 25, 2012, DOL sent to WKI via email a letter denying its 2012 H2A application because WKI "had not made a good faith effort to hire all eligible U.S. workers interested in the job opportunity, and "there were sufficient U.S. workers to fill the 85 positions sought by [WKI]."   Attached Exhibit 13.

120.    Later in the day on May 25, 2012, WKI and Mr. Campos sent a letter to DOL stating that the contracts with the 2012-Grower-Defendants "necessitated termination based on the farmers' inability to continue with the contracts due to the effects of drought and weather conditions." On May 29, 2012, DOL requested copies of the terminated contracts referenced by WKI to process WKI's request for termination due to weather conditions.

121.    On May 30, 2012, WKI sent to DOL the Agreements of Outsourcing Support attached as Exhibits 14 and 15, on which Skyline and Lack both purport to "cancel" their labor contracts with WKI due to a hailstorm and drought.

122.    No sudden drought occurred in Southern New Mexico in May 2012.  Any drought was longstanding and its effects on agriculture were foreseeable to all 2012-Defendants before they contracted with one another in February and March 2012.

123.    Hail did not damage crops of the 2012-Grower-Defendants in a way that compromised their need for seasonal agricultural labor as stated on their agreements with WKI.

124.    Mr. Campos's statements to DOL citing drought and hail as the reasons for cancellation of WKI's 2012 H2A application were false.

125.     The 2012-Defendants sought to terminate WKI's 2012 H2A application not because of drought or hail, but because they concluded it would not succeed in allowing them to access Mexican H2A workers rather than U.S. workers.

126.     Drought and hail did not have any unusual effect on the need for seasonal labor experienced by Skyline and Lack between June 1, 2012 and August 15, 2012.

127.     Lack and Skyline actually hired and used seasonal labor during the period of June 1, 2012 and August 15, 2012.  They simply got this labor from their usual farm labor contractors rather than from WKI or Plaintiffs.

128.     At a final meeting at the BAWC, in or around late-May 2012, JAIME CAMPOS or his assistants informed the workers who had accepted their job offer that they should be ready to start work the next day.  Most or all of the 2012-El Paso-Plaintiffs were present at that meeting.

129.     That evening, after the meeting, the 2012-El Paso-Plaintiffs prepared to leave for work the next morning and packed their bags.

130.     The next morning, the 2012-El Paso-Plaintiffs were ready to leave for work with the 2012-Defendants.  These Plaintiffs waited at the BAWC for WKI to pick them up and transport them to the job site as promised.  None of the 20120Defendants ever arrived at the BAWC to transport the workers, that day or any day after.

131.     In late-May 2012, JAIME CAMPOS telephoned the Trejo Family to tell them that a storm damaged the crop in New Mexico so the job was cancelled.

132.     The 2012-Plaintiffs had difficulty obtaining other work after the 2012-Defendants unilaterally breached their employment contracts.  Some Plaintiffs were out of work for the entire duration of the contract, until mid-August, despite their efforts to secure employment.  For those Plaintiffs that did find replacement work, the jobs that they found paid less than the job that they accepted from the 2012-Defendants.

22

133.    At all times that the 2012-Defendants caused employment information to be provided to the 2012-Plaintiffs as stated above, the 2012-Defendants knew that the information provided about the terms and conditions of the work was false and misleading.

134.    In the alternative, at all times that the 2012-Defendants caused employment information to be provided to the 2012-Plaintiffs, the 2012-Defendants did so recklessly, as positive assertions, and without knowledge of whether this information was accurate.

135.    From WKI's inception through 2012, and at all times relevant to this lawsuit, no person ever paid WKI any money for anything.

## CAUSES OF ACTION

136.    Plaintiffs re-allege paragraphs 14 through 135 above, and incorporate all of these paragraphs to support each of the following seven causes of action.

### FIRST CAUSE OF ACTION: AWPA

137.    At all times relevant to this action, all Plaintiffs were engaged in "agricultural employment" within the meaning of AWPA, 29 U.S.C. § 1802(3).

138.    At all times relevant to this action, all Plaintiffs were "migrant agricultural workers" within the meaning of AWPA, 29 U.S.C. § 1802(8).

139.    At all times relevant to this action, each and every Defendant was a "person" within the meaning of AWPA, 29 U.S.C. § 1802(9).

140.    At all times relevant to this action, each of the following Defendants (Grower Defendants) was an "agricultural employer" within the meaning of AWPA, 29 U.S.C. § 1802(2): RJF, CEI, CAB, Tierra, Lack, and Skyline.

141.    At all times relevant to this action, Defendants WKI and JAIME CAMPOS were "farm labor contractors" within the meaning of AWPA, 29 U.S.C. § 1802(7).

A.  The 2011-Plaintiffs and 2011-Defendants

142.    All of the 2011-Defendants intentionally violated all of the 2011-Plaintiffs' AWPA rights

by:

   a.  knowingly providing false and misleading information to the 2011-Plaintiffs regarding

       the terms and conditions of agricultural employment, in violation of 29 U.S.C. § 1821(f);

       and

   b.  violating without justification the terms of the "working arrangement" made with the

       2011-Plaintiffs, in violation of 29 U.S.C. § 1822(c).

143.    The 2011-Defendants intentionally violated the six 2011-El Paso-Plaintiffs' AWPA

rights by allowing recruitment by people who do not possess a farm labor contractor registration

certificate, in violation of 29 U.S.C. § 1811.

144.    The 2011-Defendants intentionally violated Plaintiff ENRIQUE ROJAS-TORRES's

AWPA rights by:

   a.  failing to disclose to Mr. Rojas-Torres at the time of recruitment, in writing, the terms

       and conditions of employment, in violation of 29 U.S.C. § 1821(a); and

   b.  failing to provide to Mr. Rojas-Torres the required written disclosures in a language that

       he could understand (namely Spanish) at the time of recruitment, in violation of 29

       U.S.C. § 1821(g).

145.    The 2011-Defendants' AWPA violations proximately caused actual damages to each of

the 2011-Plaintiffs.

B.  The 2012-Plaintiffs and 2012-Defendants

146.    The 2012-Defendants intentionally violated the 2012-Plaintiffs' AWPA rights by:

    a.  knowingly providing false and misleading information to the 2012-Plaintiffs regarding the terms and conditions of agricultural employment, in violation of 29 U.S.C. § 1821(f); and

    b.  violating without justification the terms of the "working arrangement" made with the 2012-Plaintiffs, in violation of 29 U.S.C. § 1822(c).

147.   The 2012-Defendants intentionally violated the four 2012-El Paso-Plaintiffs' AWPA rights by allowing recruitment by people who do not possess a farm labor contractor registration certificate, in violation of 29 U.S.C. § 1811.

148.   The 2012-Defendants intentionally violated Plaintiff ESTEBAN ALFARO-HUITRON's AWPA rights by:

    a.  failing to disclose to Mr. Rojas-Torres at the time of recruitment, in writing, the terms and conditions of employment, in violation of 29 U.S.C. § 1821(a); and

    b.  failing to provide to Mr. Rojas-Torres the required written disclosures in a language that he could understand (namely Spanish) at the time of recruitment, in violation of 29 U.S.C. § 1821(g).

149.   The 2012-Defendants' AWPA violations proximately caused actual damages to each of the 2012-Plaintiffs.

SECOND CAUSE OF ACTION: CIVIL CONSPIRACY

A.  The 2011-Plaintiffs and 2011-Defendants

150.   All of the 2011-Defendants had a meeting of the minds as to their common unlawful objective, which was to access H2A foreign guest workers without:

    a.  preferring U.S. workers as required by federal H2A law; or

    b.  paying the Adverse Effect Wage Rate required by federal H2A law.

151.    The 2011-Defendants undertook overt illegal acts in furtherance of their conspiracy, including without limitation:

   a.   submitting an H2A application to DOL that contained false statements as to the 2011-Defendants' need for foreign laborers;

   b.   submitting an H2A application to DOL that contained false statements as to the wage rate that would be paid to workers;

   c.   submitting an H2A application to DOL that contained false assurances that U.S. workers would be preferred over foreign workers; and

   d.   submitting false statements to DOL as to why WKI sought to cancel its H2A application.

152.    The 2011-Defendants' conspiracy proximately caused damage to each of the 2011-Plaintiffs.

B.  The 2012-Plaintiffs and 2012-Defendants

153.    All of the 2012-Defendants had a meeting of the minds as to their common unlawful objective, which was to access H2A foreign guest workers without:

   a.   preferring U.S. workers as required by federal H2A law; or

   b.   paying the Adverse Effect Wage Rate required by federal H2A law.

154.    The 2012-Defendants undertook overt illegal acts in furtherance of their conspiracy, including without limitation:

   a.   submitting an H2A application to DOL that contained false statements as to the 2012-Defendants' need for foreign laborers;

   b.   submitting an H2A application to DOL that contained false statements as to the wage rate that would be paid to workers;

   c.   submitting an H2A application to DOL that contained false assurances that U.S. workers would be preferred over foreign workers; and

d.  submitting false statements to DOL as to why WKI sought to cancel its H2A application.

155.    The 2012-Defendants' conspiracy proximately caused damage to each of the 2012-Plaintiffs.

## THIRD CAUSE OF ACTION: BREACH OF CONTRACT

A.  Contracts Between 2011-Plaintiffs and 2011-Defendants

156.    WKI entered into employment contracts with each of the 2011-Plaintiffs, both for itself and as agent for each 2011-Grower-Defendant.  The terms of each contract are specified in attached Exhibit 6.

157.    Each of the 2011-Plaintiffs tendered their performance under their employment contracts as required by presenting themselves ready to work, but WKI and the 2011-Grower-Defendants breached their employment contracts with each 2011-Plaintiff by failing to provide any of the promised work to any of the 2011-Plaintiffs.

158.    Each breach of an employment contract by a 2011-Defendant proximately caused damages to each 2011-Plaintiff.

B.  Third-Party Beneficiaries to Contracts Between WKI and 2011-Grower-Defendants

159.    The 2011-Grower-Defendants entered into contracts with WKI as shown in attached Exhibits 2 to 4.

160.    The 2011-Grower-Defendants and WKI understood and intended that their contracts would confer substantial benefits on a class of U.S. workers that included the 2011-Plaintiffs, namely that these workers would earn a wage of $9.71 per hour plus free housing and transportation.

161.    Each 2011-Grower-Defendant breached its contract with WKI by

a.  informing WKI that they would not accept the workers described by the contract;

b.  hiring replacement workers outside the contract; and

27

c.   falsely claiming that weather events precluded them from performing the contract.

162.   Each breach of a WKI-Grower contract by a 2011-Defendant proximately caused damages to each 2011-Plaintiff.

163.   Each 2011-Defendant acted with a culpable mental state–including malice, recklessness, wantonness, oppressiveness and intent to defraud–when committing each of its breaches of contract as alleged in paragraphs 157 and 161 above, subjecting each 2011-Defendant to liability for punitive damages to each 2011-Plaintiff.

C.  The 2012-Plaintiffs and 2012-Defendants

164.   WKI entered into employment contracts with each of the 2012-Plaintiffs, both for itself and as agent for each 2012-Grower-Defendant.  The terms of each contract are specified in attached Exhibit 11.

165.   Each of the 2012-Plaintiffs tendered their performance under their employment contracts as required by presenting themselves ready to work, but WKI and the 2012-Grower-Defendants breached their employment contracts with each 2012-Plaintiff by failing to provide any of the promised work to any of the 2012-Plaintiffs.

166.   Each breach of an employment contract by a 2012-Defendant proximately caused damages to each 2012-Plaintiff.

D.  Third-Party Beneficiaries to Contracts Between WKI and 2012-Grower-Defendants

167.   The 2012-Grower-Defendants entered into contracts with WKI as shown in attached Exhibits 8 and 9.

168.   The 2012-Grower-Defendants and WKI understood and intended that their contracts would confer substantial benefits on a class of U.S. workers that included the 2012-Plaintiffs, namely that these workers would earn a wage of $9.94 per hour plus free housing and transportation.

169.   Each 2012-Grower-Defendant breached its contract with WKI by

   a.   informing WKI that they would not accept the workers described by the contract;

   b.   hiring replacement workers outside the contract; and

   c.   falsely claiming that weather events precluded them from performing the contract.

170.   Each breach of a WKI-Grower contract by a 2012-Defendant proximately caused damages to each 2012-Plaintiff.

171.   Each 2012-Defendant acted with a culpable mental state–including malice, recklessness, wantonness, oppressiveness and intent to defraud–when committing each of its breaches of contract as alleged in paragraphs 165 and 169 above, subjecting each 2012-Defendant to liability for punitive damages to each 2012-Plaintiff.

FOURTH CAUSE OF ACTION: FRAUD

A.  The 2011-Plaintiffs and 2011-Defendants

172.   All 2011-Defendants made the following false representations to all 2011-Plaintiffs:

   a.   each of the 2011-Grower-Defendants needed foreign workers because sufficient numbers of U.S. workers were not available to them;

   b.   each of the 2011-Grower-Defendants contracted with WKI to recruit and hire U.S. workers to work at the 2011-Grower-Defendants' businesses to the extent that U.S. workers were available, and otherwise to recruit and hire foreign H2A workers; and

   c.   WKI would ensure that foreign and U.S. workers were paid $9.71 per hour.

173.   All 2011-Defendants made these representations to all 2011-Plaintiffs by causing WKI to file attached Exhibits 5 and 6 with DOL while knowing that the false representations contained in this document would be published in efforts to recruit U.S. workers.

174.   When each of the 2011-Defendants caused each false representation to be made in September 2011, each of them:

29

a.  knew that each representation was false, or

b.  made each representation with reckless disregard for its truth.

175.  Each of the 2011-Defendants made each false representation with the intent and expectation that each false representation would be communicated to U.S. workers of a class that includes the 2011-Plaintiffs, and that this class of U.S. workers would rely on each false representation.

176.  WKI recorded each false representation on an H2A application reproduced in attached Exhibit 5, and filed this application with DOL knowing that the terms of the application would be communicated to a class of U.S. workers that includes the 2011-Plaintiffs.

177.  All 2011-Defendants sought to benefit from each false representation by gaining access to low-cost foreign H2A guest workers, and paying less than required under law for their services.

178.  The 2011-Plaintiffs learned each false representation from:

a.  WKI employees at BAWC in El Paso County in mid-November 2011 as described above for the six 2011-El Paso-Plaintiffs; and

b.  Texas Workforce Solutions employees at their offices in Hidalgo County in mid-November 2011 as described above for the four 2011-Hidalgo-Plaintiffs.

179.  All 2011-Defendants intended for U.S. workers, including Plaintiffs, to rely on these false representations, or had reason to expect that they would do so.

180.  All 2011-Plaintiffs acted in reliance on these false representations by accepting the employment offered in Exhibit 6, and by preparing to leave their homes to perform their employment agreements with the 2011-Defendants.

181.  The 2011-Defendants' fraud proximately caused damages to all ten 2011-Plaintiffs.

B.  The 2012-Plaintiffs and 2012-Defendants

182.    All 2012-Defendants made the following false representations to all 2012-Plaintiffs:

    a.  each of the 2012-Grower-Defendants needed foreign workers because sufficient numbers of U.S. workers were not available to them;

    b.  each of the 2012-Grower-Defendants contracted with WKI to recruit and hire U.S. workers to work at the 2012-Grower-Defendants' businesses to the extent that U.S. workers were available, and otherwise to recruit and hire foreign H2A workers; and

    c.  WKI would ensure that foreign and U.S. workers were paid $9.94 per hour.

183.    All 2012-Defendants made these representations to all 2012-Plaintiffs by causing WKI to file attached Exhibits 10 and 11 with DOL while knowing that the false representations contained in this document would be published in efforts to recruit U.S. workers.

184.    When each of the 2012-Defendants caused each false representation to be made in September 2011, each of them:

    a.  knew that each representation was false, or

    b.  made each representation with reckless disregard for its truth.

185.    Each of the 2012-Defendants made each false representation with the intent and expectation that each false representation would be communicated to U.S. workers of a class that includes the 2012-Plaintiffs, and that this class of U.S. workers would rely on each false representation.

186.    WKI recorded each false representation on an H2A application reproduced in attached Exhibit 10, and filed this application with DOL knowing that the terms of the application would be communicated to a class of U.S. workers that includes the 2012-Plaintiffs.

187.    All 2012-Defendants sought to benefit from each false representation by gaining access to foreign H2A guest workers, and paying less than required under law for their services.

188.   The 2012-Plaintiffs learned each false representation from:

   a.   WKI employees at BAWC in El Paso County in 2012 as described above for the four 2012-El Paso-Plaintiffs; and

   b.   Texas Workforce Solutions employees at their offices in Hidalgo County in 2012 as described above for the Trejo Family.

189.   All 2012-Defendants intended for U.S. workers, including Plaintiffs, to rely on these false representations, or had reason to expect that they would do so.

190.   All 2012-Plaintiffs acted in reliance on these false representations by accepting the employment offered in Exhibit 11, and by preparing to leave their homes to perform their employment agreements with the 2012-Defendants.

191.   The 2012-Defendants' fraud proximately caused damages to all eight 2012-Plaintiffs.

**JURY DEMAND**

Plaintiffs demand trial by jury on all claims on which they have a right to trial by jury.

**PRAYER**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment to include as allowed by law:

   a.   enter a declaratory judgment that all nine Defendants violated Plaintiffs' AWPA rights as set forth in the preceding paragraphs, conspired to violate federal H2A law, and defrauded Plaintiffs;

   b.   for each AWPA violation by each Defendant, award each Plaintiff statutory damages of $500 per violation or actual damages for each violation, whichever is greater, pursuant to 29 U.S.C. § 1854;

   c.   award each Plaintiff their actual, incidental, and consequential damages resulting from Defendants' conspiracies, breaches of contract, and fraud;

d.   award each 2011-Plaintiff punitive damages from each 2011-Defendant;

e.   award each 2012-Plaintiff punitive damages from each 2012-Defendant;

f.   award Plaintiffs their reasonable litigation expenses and costs of court;

g.   award Plaintiffs prejudgment and post-judgment interest as allowed by law; and

h.   award Plaintiffs all other relief that this Court deems just and proper.


April 10, 2015                                       Respectfully submitted,

                                                     TEXAS RIOGRANDE LEGAL AID, INC.
                                                     1331 Texas Avenue
                                                     El Paso, Texas  79901
                                                     Tel. (915) 585-5120
                                                     Fax. (915) 533-5108

                                                     _____
                                                     Jerome Wesevich
                                                     jwesevich@trla.org
                                                     N.M. Bar No. 20389
                                                     Admitted to Practice in D.N.M.

                                                     Christopher Benoit
                                                     cbenoit@trla.org
                                                     Texas Bar No. 24068653
                                                     Admitted to Practice in D.N.M.

                                                     *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on the date next to my signature above I electronically filed the foregoing document and all referenced exhibits and attachments using the Court's CM/ECF system, which provides notice and service of these documents to all parties who have appeared and attorneys of record in this civil action.

I further certify that I will serve process on each new Defendant named in this First Amended Complaint pursuant to the Federal Rules of Civil Procedure, and file each return of service.


                                                     */s/ Jerome Wesevich*
                                                     Jerome Wesevich

33