# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| ESTEBAN ALFARO-HUITRON, *et al.*, | § | |
| Plaintiffs, | § | |
| | § | No. 2:15-210 JCH/WPL |
| v. | § | |
| | § | Civil Action |
| WKI OUTSOURCING SOLUTIONS, LLC, | § | |
| *et al.*, | § | |
| Defendants. | § | |

# PLAINTIFFS' RESPONSE IN OPPOSITION TO
# MOTIONS FOR SUMMARY JUDGMENT MADE BY
# DEFENDANTS CERVANTES AGRIBUSINESS AND CERVANTES ENTERPRISES

TEXAS RIOGRANDE LEGAL AID, INC.
1331 Texas Avenue
El Paso, TX 79901
(915) 585-5100

Jerome Wesevich
N.M. Bar No. 20389
Email: jwesevich@trla.org
Christopher Benoit
Texas Bar No. 24068653
Email: cbenoit@trla.org
Admitted to Practice in D.N.M.

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ...................................................................................... iii

ISSUE FOR DECISION .............................................................................................1

OVERVIEW ..............................................................................................................1

STATEMENT OF MATERIAL FACTS ......................................................................3

    i.  Material Facts Omitted from Defendants' Motions......................................3

    ii.  Plaintiffs Dispute the Following Assertions Made by CAB.........................11

    iii.  Plaintiffs Dispute the Following Assertions Made by CEI...........................14

STANDARD OF REVIEW .......................................................................................15

ARGUMENT ...........................................................................................................16

    I.  CAB/CEI CONTRACTED WITH WKI TO RECRUIT AGRICULTURAL
        LABOR .......................................................................................................16

        A.  Record Evidence Proves a Genuine Dispute as to Whether Dino Cervantes
            Signed the AOS for CAB, CEI, or Both ...........................................17

        B.  Record Evidence Proves a Genuine Dispute as to Whether SJR 225 is an
            Enforceable Contract .......................................................................18

        C.  Plaintiffs Had No Direct Contact with CAB/CEI, But This Does Not Absolve
            CAB/CEI of Liability .........................................................................20

    II.  RECORD EVIDENCE PROVES A GENUINE DISPUTE AS TO WHETHER WKI
        ACTED AS CAB/CEI'S AGENT IN HIRING PLAINTIFFS ....................................22

    III.  RECORD EVIDENCE PROVES A GENUINE DISPUTE AS TO WHETHER
        PLAINTIFFS WERE THIRD-PARTY BENEFICIARIES OF SJR 225 .....................26

    IV.  RECORD EVIDENCE PROVES GENUINE DISPUTES THAT PREVENT ANY
        SUMMARY JUDGMENT ON PLAINTIFFS' FRAUD AND AWPA CLAIMS ......28

A.   CAB/CEI'S Misrepresentations are No Less Fraudulent Because WKI
Communicated the Misrepresentations to Plaintiffs .......................................28

B.   AWPA Imposes Direct Liability on Growers Like CAB/CEI ........................31

V.  RECORD EVIDENCE PROVES A GENUINE DISPUTE AS TO WHETHER DINO
CERVATES AND JAIME CAMPOS CONSPIRED TO VIOLATE FEDERAL
LAW ............................................................................................................................33

CONCLUSION ..............................................................................................................................40

# TABLE OF AUTHORITIES

<u>CASES</u>                                                                                                   <u>Page</u>

*Aka v. Wash. Hosp. Center,* 156 F.3d 1284 (D.C. Cir. 1998) ........................................................38

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592 (1982) ................................................36

*Antenor v. D&S Farms,* 88 F.3d 925 (11th Cir. 1996) ..................................................................31

*Antuñez v. G&C Farms, Inc.,* No. 92-cv-308, 1993 WL 451344 (D.N.M. Aug. 9, 1993) .............21

*Beliz v. W.H. McLeod & Sons Packing Co.,* 765 F.2d 1317 (5th Cir. 1985) ...........................21, 26

*Boggs v. Anderson,* 381 P.2d 419 (N.M. 1963) .............................................................................18

*Brunsting v. Lutsen Mts. Corp.,* 601 F.3d 813 (8th Cir. 2010) ......................................................15

*Bueno v. Mattner,* 829 F.2d 1380 (6th Cir. 1987) .........................................................................33

*Burroughs v. APS Intern., Ltd.,* 93 S.W.3d 155, 162 (Tex. App.—Hous. [14th Dist.] 2002) ........29

*Casares v. Agri-Placements Int'l., Inc.,* 12 F. Supp. 3d 956 (S.D. Tex. 2014) .............................19

*Castillo v. Case Farms of Ohio, Inc.,* 96 F. Supp. 2d 578 (W.D. Tex. 1999) ...............................32

*Celaya v. Hall,* 85 P.3d 239 (N.M. 2004) .....................................................................................23

*Charles v. Burton,* 169 F.3d 1322 (11th Cir. 1999) .......................................................................20

*Chevron Oil Co. v. Sutton,* 515 P.2d 1283 (N.M. 1973) ................................................................21

*Craig v. Gov't Employees Ins. Co.,* 134 F.R.D. 126 (D. Md. 1991) ..............................................35

*Cuellar-Aguilar v. Deggeller Attractions, Inc.,* 812 F.3d 614 (8th Cir. 2015) ............................28

*David v. Signal Int'l,* No. 08-cv-1220, 2012 WL 10759668 (E.D. La. Jan. 4, 2012) ....................19

*De Leon-Granados v. Eller & Sons Trees, Inc.,* 581 F. Supp. 2d 1295 (N.D. Ga. 2008) .............31

*Escobar v. Baker,* 814 F. Supp. 1491 (W.D. Wash. 1993) .....................................................23, 33

*Estate of Anderson v. Denny's, Inc.,* 987 F. Supp. 2d 1113 (D.N.M 2013) ...................................23

*Ettenson v. Burke,* 17 P.3d 440 (N.M. App. 2000) ....................................................................33, 39

*Felch v. Transportes Lar-Mex SA de CV,* 92 F.3d 320 (5th Cir.1996) ............................................3

*Fanette v. Steven Davis Farms, LLC,* 28F. Supp. 3d 1243 (N.D. Fla. 2014) ...............................21

*Finnerman v. McCormich,* 499 F.2d 212 (10th Cir. 1974) ............................................................22

*Flores v. Baca,* 871 P.2d 962 (N.M 1994) ......................................................................................26

*Flores v. Rios,* 36 F.3d 507 (6th Cir. 1994) ..............................................................................20, 21

*Foster v. Allied Signal, Inc.,* 293 F.3d 1187 (10th Cir. 2002) ........................................................3

*Frederick County Fruit Growers Assn. v. Martin,* 968 F.2d 1265 (D.C. Cir. 1992) ....................28

*Gibson v. Chrysler Corporation,* 261 F.3d 927 (9th Cir. 2001) ....................................................35

*Gouveia v. Citicorp Pers.-to-Pers. Fin. Ctr., Inc.* 686 P.2d 262 (N.M. App. 1984) ....................29

*Harger v. Structural Services, Inc.,* 916 P.2d 1324 (N.M. 1996) ..................................................25

*Husky Int'l Elecs., Inc. v. Ritz,* 136 S. Ct. 1581 (2016) ................................................................28

*In re Chivers,* 275 B.R. 606 (Bankr. D. Utah 2002) ......................................................................31

*Innotext, Inc. v. Petra'Lex USA Inc.,* 694 F.3d 581 (6th Cir. 2012) ...............................................22

*Int'l Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257 (5th Cir. 1991) ..............................................30

*Issen v. GSC Enterprises, Inc.,* 538 F. Supp. 745 (N.D. Ill. 1982) ...............................................30

*LeFevre v. Space Communications Co.,* 771 F.2d 421 (10th Cir. 1985) .......................................30

*Long v. Aronov Realty Mgt., Inc.,* 645 F. Supp. 2d 1008 (M.D. Ala. 2009).................................17

*Lopes v. Vieria,* No. 1:06-cv-01243, 2011 WL 1883157 (E.D. Cal. May 17, 2011)....................31

*Maldonado v. Lucca,* 629 F. Supp. 483 (D.N.J. 1986) ..................................................................26

*Mareno v. Rowe,* 910 F.2d 1043 (2d Cir. 1990) ............................................................................35

*Marquis v. U.S. Sugar Corp.,* 652 F. Supp. 598 (S.D. Fla. 1987) .................................................19

*Martin v. Norris,* 82 F.3d 211 (8th Cir. 1996) ..............................................................................39

*McCasland v. Prather,* 585 P.2d 336 (N.M. App. 1978)..............................................18

*McCauley v. Ray,* 453 P.2d 192 (N.M. 1968)...........................................................23

*Mendoza v. Perez,* 754 F.3d 1002 (D.C. Cir. 2014)...................................................19

*In re Mercer,* 246 F.3d 391 (5th Cir. 2001) ............................................................31

*Michael v. Shiley, Inc.,* 46 F.3d 1316 (3d Cir. 1995)...............................................30

*Microsystems Inc. v. Hynix Semiconductor Inc.,* 622 F. Supp. 2d 890 (N.D. Cal. 2009).............36

*Moore v. Altra Energy Techs.,* 321 S.W.3d 727 (Tex. App. –Houston [14th Dist.] 2010) ...........30

*Mulato v. Wells Fargo Bank,* 76 F. Supp. 3d 929 (N.D. Cal. 2014)...............................35

*Portis v. Folk Constr. Co.,* 694 F.2d 520 (8th Cir. 1982) ...........................................15

*Posadas de Puerto Rico Associates, Inc. v. Sec'y of Labor,* 698 F.Supp. 396 (D.P.R. 1988).........7

*Prissert v. EMCORE Corp.,* 289 F.R.D. 342 (D.N.M. 2012)......................................35

*Ramsouer v. Midland Val. R. Co.,* 135 F.2d 101 (8th Cir. 1943) ...................................15

*Romero v. Mervyn's,* 784 P.2d 992 (N.M. 1989)......................................................21

*Salazar v. Presidio Valley Farmers Assn.,* 765 F.2d 1334 (5th Cir. 1985) ........................28

*Saylor v. Valles,* 63 P.3d 1152 (N.M. App. 2002) ....................................................28

*Schlumberger Ltd., et al. v. Asmoro, et al.,* No. 10-cv-1235,
2010 WL 10900249 (D.N.M. Dec. 23, 2010) ...........................................................19

*Segura v. Colmbe,* 895 F. Supp. 2d 1141 (D.N.M. 2012)............................................23

*State v. Ross,* 521 P.2d 1161 (N.M. App. 1974)......................................................35

*Stokes v. S. States Coop, Inc.,* 651 F.3d 911 (8th Cir. 2011) ......................................15

*Stotlar v. Hester,* 582 P.2d 403 (N.M. App. 1978).....................................................26

*Teleconnect Co. v. Ensrud,* 55 F.3d 357 (8th Cir. 1995) ............................................15

*United States v. Espino,* 317 F.3d 788 (8th Cir. 2003) ...............................................35

*United States v. Feola,* 420 U.S. 671 (1975) ...................................................................33

*United States v. Greene,* 146 F. 803 (D. Ga. 1906) ..........................................................33

*United States v. Jiminez-Perez,* 501 F.3d 976 (8th Cir. 2007)........................................35

*United States v. Kroh,* 915 F. 2d 326 (8th Cir. 1990) .......................................................35

*United States v. Pruett,* 501 F.3d 976 (8th Cir. 2007) ....................................................35

*Vega v. Nourse Farms, Inc.,* 62 F. Supp. 2d 334 (D. Mass. 1999) ...........................23, 36

*Villalobos v. N. Carolina Growers Ass'n, Inc.,* 252 F. Supp. 2d 1 (D.P.R. 2002) ........23

*Westborough Mall, Inc. v. Cape Girardeau,* 693 F.2d 733 (8th Cir. 1982) ..................35

*Wright v. West,* 505 U.S. 277 (1992) ...............................................................................39

## STATUTES

8 U.S.C. § 1101(a)(15)(H)(ii)(A)......................................................................................3

8 U.S.C. § 1188....................................................................................................3, 36

29 U.S.C. § 1801.........................................................................................2, 16, 20

29 U.S.C. § 1802(2) .........................................................................................31

29 U.S.C. § 1811....................................................................................................32

29 U.S.C. § 1822(c) ..........................................................................................31

29 U.S.C. § 1821(a) ..........................................................................................33

29 U.S.C. § 1821(a)-(g) .....................................................................................33

29 U.S.C. § 1821(f)..........................................................................................32

29 U.S.C. § 1842.............................................................................................32

REGULATIONS

20 C.F.R. § 655.103 ...................................................................................................22

20 C.F.R. § 655.122(a) ................................................................................................3

20 C.F.R. § 655.132(a)-(b)(4) ...........................................................................1, 4, 5, 28

20 C.F.R. § 655.132(a) ...............................................................................................22

20 C.F.R. § 655.132(b)(4) ..............................................................................18, 20, 22

20 C.F.R. § Ch. V, Pt. 655, Subpt. B ................................................................24, 25

20 C.F.R. § 655.103(a)................................................................................................36

OTHER

RESTATEMENT (SECOND) OF AGENCY § 14 cmt ........................................................23

RESTATEMENT (SECOND) OF AGENCY § 226 (1977)................................................22

RESTATEMENT (SECOND) OF TORTS § 531 (1977) ...............................................29, 30, 34

RESTATEMENT (SECOND) OF TORTS§ 531 cmt. c (1977). .............................................30

U.S. DEPT. OF LABOR, *Report Adopting AWPA Regulations,*
62 FED. REG. 11734 (Mar. 12, 1997) ......................................................................26

SOUTHERN POVERTY LAW CENTER,
*Close to Slavery–Guestworker Programs in the United States* (2013).........................................19
https://www.splcenter.org/20130218/close-slavery-guestworker-programs-united-states

Defendants Cervantes Agribusiness (CAB) and Cervantes Enterprises, Inc. (CEI) filed separate, similar motions seeking summary judgment that neither is liable on any claim asserted against them.  Docs. 185 and 186.  Plaintiffs[1] resist both motions as follows:

## ISSUE FOR DECISION

Whether the record viewed in the light most favorable to Plaintiffs shows genuine dispute as to facts needed to decide all claims against CAB and CEI.

## OVERVIEW

Dino Cervantes is general manager for both CAB and CEI.  He admits that he signed a one-page "Agreement" to access Mexican agricultural workers under the federal "H2A" guest worker program.  SJR 76, 225.[2]  Whether he signed SJR 225 on behalf of CAB, CEI, or both (CAB/CEI) is a disputed question of fact.

Under federal law, Defendants Jaime Campos and WKI Outsourcing Solutions, Inc. (collectively WKI) needed SJR 225 to petition for H2A workers.  20 C.F.R. § 655.132(a)-(b)(4).  WKI used SJR 225 to petition the U.S. Department of Labor (DOL) for foreign H2A workers on September 30, 2011.  Between October 6, 2011 and November 11, 2011, WKI wrote to DOL five times emphasizing that the fixed-site employers including CAB/CEI faced an "emergency" shortage of laborers.  Between November 14 and 17, 2011, WKI hired Plaintiffs as U.S. workers according to the terms of WKI's H2A application, which included an especially attractive wage

---

[1] The nine Plaintiffs who assert claims against CAB and CEI are: Esteban Alfaro-Huitron, Eleazar Garcia-Mata, Jose Antonio Garcia-Mata, Juan Guzman, Raul Jasso-Cerda, Enrique Rojas-Torres, Lazaro Rojas-Torres, Trinidad Santoyo-Garcia, and Pedro Tamez.  Doc. 103 at ¶ 72.

[2] Plaintiffs use "SJR [page #]" to cite the 277-page Summary Judgment Record attached to this document and filed as Docs. 206-1 through 206-7.  Gaps in appear in the SJR numbering of the attached record because Plaintiffs excised uncited pages as the Court ordered in Doc. 205.  The pages cited in this response range from SJR 1 through SJR 411.  The Exhibit List that appears at SJR 1-3 describes each cited document.  Green highlighting directs the Court to the particular portions of the SJR upon which Plaintiffs rely, pursuant to D.N.M. LOC. R. 10.6 and 56.1(b).

rate of $9.71 per hour.  During this period, so many U.S. workers applied for the jobs that WKI realized that it was unlikely to be approved for any Mexican workers.  On November 22, only eleven days after writing to DOL that the labor shortage presented an "emergency," Mr. Campos informed DOL that drought eliminated the growers' need for labor, which was false.  CAB/CEI assigned the work covered by SJR 225 to U.S. workers who it had employed for up to 40 years, instead of Plaintiffs, and paid them New Mexico's minimum wage of $7.50 per hour.

Plaintiffs filed this lawsuit because they were not provided any of the work that they were promised under WKI's H2A application.  Plaintiffs pleaded several claims in the alternative based on Dino Cervantes's decision to contract for workers through WKI, renege on the contracts that WKI made, and ultimately supply the contracted work to others: (a) violation of the Agricultural Worker Protection Act, 29 U.S.C. § 1801, *et seq.*, Doc. 103 at ¶¶ 142-45; (b) breach of the contract that appears in Doc. 103-6 because WKI made this contract with Plaintiffs as CAB/CEI's agent, Doc. 103 at ¶¶ 156-58; (c) breach of the contract that appears in SJR 225 because Plaintiffs were third-party beneficiaries to this contract, Doc. 103 at ¶¶ 159-62; (d) fraud based on the misrepresentations that CAB/CEI knew or should have known that WKI would communicate to the class of people that includes Plaintiffs, Doc. 103 at ¶¶ 172-81; and (e) civil conspiracy between CAB/CEI and WKI to subvert federal H2A law by accessing Mexican workers despite the obvious availability of U.S. workers and the refusal to pay the required wage rate of $9.71 per hour, Doc. 103 at ¶¶ 150-52.

A jury should decide whether actionable conduct—be it breach of contract, fraud, or conspiracy—led CAB/CEI to sign SJR 225 knowing that WKI would use it to submit an H2A application that first required recruitment of U.S. workers, including Plaintiffs.

## STATEMENT OF MATERIAL FACTS

Per D.N.M. Loc. R. 56.1(b), Plaintiffs letter their presentation of material facts and number their disputes with Defendants' assertions of fact.  Many facts asserted by CAB in Doc. 185 at 4-6 and by CEI in Doc. 186 at 4-6 are disputed and the undisputed facts that they cite are quite incomplete.  This is why Plaintiffs begin with their statement of the material facts needed to decide Docs. 185 and 186.  All reasonable inferences from the cited evidence are to be made in Plaintiffs' favor.  *Foster v. Allied Signal, Inc.*, 293 F.3d 1187, 1192 (10th Cir. 2002).

### i.      Material Facts Omitted from Defendants' Motions

A.  Federal "H2A" law permits foreign agricultural guest workers into the United States only if: (1) an insufficient number of U.S. workers accept the jobs after being offered the jobs ahead of foreign workers; and (2) the "adverse effect wage rate" (AEWR, which was $9.71 per hour for New Mexico during 2011) is paid to all U.S. and foreign workers who accept the jobs. 8 U.S.C. § 1101(a)(15)(H)(ii)(A); *id.* at § 1188(a)(1); 20 C.F.R. § 655.122(a); SJR 142-43, 153.

B.  For decades Southern New Mexico chile, pecan, and onion growers have not accessed foreign H2A labor.  Instead they rely upon local workers to perform their seasonal agricultural labor and pay the New Mexico minimum wage, which is now $7.50 per hour.  An abundance of farm laborers reside in the El Paso, Texas area, which keeps wages low.  SJR 7, 57, 142, 158, 191-94, 199-200, 215, 338-42, 395-96; Doc. 186-4 at 2; Doc. 186-5 at 3.

C.  Defendant Jaime Campos believed that Southern New Mexico growers were dissatisfied with the quality of the U.S. workers who they could attract to perform difficult seasonal field labor, which led him to incorporate WKI in December 2009.  WKI's sole purpose was to import Mexican agricultural laborers under the federal H2A program.  SJR 7-9, 15-17, 35, 37, 79-80, 85, 122-24, 194, 211, 377-79, 387-90.

3

D.  Beginning in 2010, WKI visited mayors throughout the Mexican state of Chihuahua and compiled a list of some two thousand Mexican nationals who agreed to be drug-tested prior to traveling to the U.S. for H2A work.  SJR 7-10, 44, 387-90.

E.  In the summer and fall of 2011, Mr. Campos approached Southern New Mexico growers seeking "guinea pigs" who were willing to demonstrate that Mexican H2A labor could serve the region's labor needs.  SJR 16.

F.  On June 12, 2011, the El Paso Times published a newspaper article describing WKI's business plan.  Mr. Campos cooperated in preparing this article and approved it as an accurate statement of how and why WKI operated for profit.  SJR 7-10, 387-90.

G.  Ronald Franzoy owns and manages Former Defendant RJF Farms, Inc.  SJR 114.  Mr. Campos and Ronald Franzoy discussed WKI's plan to import Mexican H2A workers many times, a plan that Ronald Franzoy enthusiastically supported.  SJR 16, 122-24.  Ronald Franzoy sought Mexican seasonal workers because he considered U.S. workers unreliable and unstable, and he saw not only how diligent and productive Mexican workers were, but also how they were pleased to receive minimum wage:

> I would prefer that all my help comes from Mexico.  They've been drug-tested, and they have been trained, and they are made available for me to work in whatever number I need.  That is what I prefer.  And that's what I've been working towards.
> ...
>
> Well, they are only getting $4 a day in Mexico.  I think that's a big improvement, to come over here and make $7.50 an hour.

SJR 122, 138; *see also* SJR 131 (RJF agreed to pay Campos his standard $8.65 per hour, $7.50 for the worker and $1.15 for WKI); SJR 133 ("I had stipulated to Jaime Campos that I wanted the [WKI] workers out of Mexico.  That was the stipulation from the beginning.   It's what we talked about in the [El Paso Times, SJR 387] article.  That's it.  That's what I was interested in.").

4

H.  WKI prepared a one-page form "Agreement of Outsourcing Support" (AOS) that it signed with Southern New Mexico growers to meet the requirements of 20 C.F.R. § 655.132. SJR 13, 34-35, 37, 60, 225.

I.  Ronald Franzoy signed WKI's form AOS on September 22, 2011.  SJR 126, 226.

J.  Ronald Franzoy's brother Marty Franzoy is managing partner of former Defendant Skyline Produce, LLC.  SJR 97.  Ronald Franzoy allegedly signed WKI's form AOS on behalf of Skyline in 2012 for an H2A application that WKI filed months after the H2A application at issue in this case.  SJR 227.  Marty Franzoy never admitted approving this AOS.  Instead, he testified that anyone who would do so was either "desperate or stupid," that Mr. Campos forged his brother Ronald's signature on the AOS, and that Mr. Campos is a "crook."  SJR 98, 108; *but see* SJR 40-41 (Mr. Campos claims he was present when Franzoys approved).

K.  Dino Cervantes signed WKI's form AOS on September 10, 2011.  SJR 73, 79, 225. When Dino Cervantes signed the AOS, Dino Cervantes knew that Jaime Campos would use the AOS to apply for H2A workers, and that federal law required the AOS as part of WKI's H2A application.  SJR 13, 35, 60, 78-80; *see also* 20 C.F.R. § 655.132(a)-(b)(4) ("work contracts" from "fixed-site employers" are required in order to submit an H2A application).

L.  Dino Cervantes did not sign WKI's AOS because he was experiencing a shortage of U.S. workers for his businesses.  SJR 85.  Instead, at all relevant times, CAB and CEI had access to all U.S. seasonal workers that they needed through Jesus Maldonado, a licensed farm labor contractor who has supplied all seasonal labor needs to Dino Cervantes's satisfaction for forty years.  SJR 191, 194-97 (Cervantes increased Maldonado's pay from 50 cents per hour per worker to 91 cents), 199 ("We always have had the workers that we need."), 201; Doc. 186 at 2 (CEI had no need for seasonal workers like Plaintiffs).

M.  Dino Cervantes signed the AOS specifically to replace U.S. workers with Mexican H2A workers.  As Dino Cervantes explained,

> We have relationships with other people that would hire U.S. workers.  If [Mr. Campos] was going to do the same thing [and] I have other people that can do it, why would I hire him?

SJR 82; *see also* SJR 79 ("I would use the workers if [WKI] was able to obtain them ... under H-2A."); SJR 79-80 (Mr. Campos "was proposing a new business that was – that was involving foreign workers through the H-2A program, and it sounded interesting to me.  So that's why I met with him."); SJR 82-83 (Mr. Cervantes remembers nothing further about his September 10 meeting with Mr. Campos and has no way of refreshing his recollection.).

N.  At all relevant times, Dino Cervantes managed two businesses owned by his family, CEI and CAB.  SJR 75-76, 88.  The Cervantes family has been involved in Southern New Mexico agriculture for multiple generations.  SJR 83.  CEI and CAB are long-established Southern New Mexico business with permanent employees, assets including several buildings, and millions of dollars in revenue each year.  Doc. 109 at ¶ 5; SJR 217-18.  CEI processes crops grown by CAB.  SJR 76.

O.  Dino Cervantes does not manage labor for CAB and CEI separately.  After working for Dino Cervantes for 40 years, farm labor contractor Jesus Maldonado knows only that he is employed by Dino Cervantes, not whether he is employed by CAB or CEI, or what the difference is.  SJR 194-96.  Mr. Maldonado submits his time sheets at CEI, which is where the terms of his pay are written.  SJR 202.  While CEI now claims that it ceased all farming operations over a decade ago, Dino Cervantes consistently approved time sheets of farm laborers, including Jesus Maldonado, that bear both CAB's and CEI's names indiscriminately between 2010 and 2013.  SJR 343-376.  Dino Cervantes did not inform Mr. Campos how CAB is

6

distinguished from CEI.  SJR 45, 70, 72.   Mr. Campos wrote "Cervantes Enterprises" on his

H2A application because Dino Cervantes provided CEI's business card to Mr. Campos.  SJR 45.

      P.  At all relevant times, Defendants WKI and Campos had:

          (a) no experience whatsoever in supplying H2A or any other type of farm labor to

          anyone, SJR 36, 57, 131;

          (b) no assets or any kind of tools needed for farm work (buckets, gloves, clippers,

          etc.), SJR 14, 23-25, 48;

          (c) no money paid from any person for WKI's work, SJR 36; and

          (d) no knowledge of farming or farmworker supervision, SJR 11-12, 25, 93, 131.

      Q.  The only hourly wage that Dino Cervantes paid for seasonal labor was the New

Mexico minimum wage of $7.50 per hour, and never more.  SJR 193-94; *see also* SJR 81, 197,

336 (CAB/CEI used $8.87 per as its multiplier, still providing the seasonal workers with $7.50).

      R.  Dino Cervantes knew that the AEWR had to be paid to H2A workers, but he never

agreed to pay the adverse effect wage rate of $9.71 per hour to the H2A workers to be supplied

by Defendants WKI and Campos.  SJR 80 ("The wages were never discussed ....."); Doc. 185 at 9

(arguing absence of compensation term).

      S.  On September 29, 2011, Mr. Campos used the AOS signed by CAB to petition for

H2A workers who would perform labor at "fixed-site employers" including CAB and RJF farms.

SJR 17, 37, 60, 228-37.

      T.  To petition for these H2A workers, Mr. Campos swore under penalty of perjury that no

qualifications or experience would be necessary to be hired for these jobs, all willing U.S.

workers would be hired for the jobs prior to hiring any Mexican workers, and the pay to all U.S.

and Mexican workers would be the AEWR of $9.71 per hour.  SJR 22, 158-59, 228-37, 281-98,

314.  These promises were required by federal law to apply for H2A workers.  *Posadas de Puerto Rico Associates, Inc. v. Sec'y of Labor of U.S.*, 698 F. Supp. 396, 398 (D.P.R. 1988).

U.  Beginning on October 14, 2011 and through November 11, 2011, WKI wrote DOL at least five times emphasizing the "Emergency Situation" and requesting permission to admit foreign H2A workers due to the critical labor needs faced by the growers listed on WKI's H2A application.  SJR 60, 246, 249, 257, 259, 267, 300, 305, 306.

V.  DOL and TWC identified numerous deficiencies in WKI's H2A application, which WKI attempted to correct.  SJR 238-67.  One deficiency involved CAB/CEI, and on October 27, 2011, Mr. Campos supplied DOL with additional detail concerning CAB/CEI's business operations.  SJR 260.  Mr. Campos wrote to DOL that CEI is a farm operator and owner that produces agricultural commodities in addition to operating a packing shed, which was a representation that  DOL required to approve WKI's H2A application.  SJR 45, 260.  Mr. Campos knows nothing about how to distinguish CEI from CAB, so a jury may reasonably conclude that on or near October 27, 2011, Mr. Campos got the additional CEI information that DOL requested from Dino Cervantes or "people that work in the office" at CEI.  SJR 72.

W.  DOL partially certified WKI's H2A application on November 14, 2011 and ordered WKI to cooperate with the Texas Workforce Commission (TWC) in continuing to attempt to recruit U.S. workers for the job as stated on its application.  SJR 268-69. WKI never had an H2A application certified prior to this one.  SJR 12, 36, 57, 379.

X.  Plaintiffs are citizens or lawful permanent residents of the United States.  Plaintiffs have worked as seasonal farm laborers for decades, customarily earning near the New Mexico minimum wage of $7.50 per hour.  So Plaintiffs considered earning the AEWR of $9.71 per hour to be highly desirable pay, particularly for November to March, a season when work is often

8

scarce.  SJR 141-43, 153, 163-64, 396, 404-41; Doc. 186-4 at 2; Doc. 186-5 at 4.

Y.  WKI hired each Plaintiff on the following terms: no qualifications required, pay at the AEWR for New Mexico of $9.71 per hour, 35 hours per week, work between November 28, 2011 and March 9, 2012, and free housing and transportation to the worksite each day.  SJR 143, 157, 276-98, 404-411; Doc. 186-4 at 3.

Z.  Yet when TWC employees interviewed Mr. Campos, he told them that he intended to provide work only to those persons who he considered the "best" workers, be they Mexican or U.S. workers.  SJR 314 ("Mr. Campos then proceeded to ask Mr. Cerda how he could modify the contract.  He wanted to ensure that he is able to select the 'best workers.'"); SJR 333 ("Mr. Campo[s] ... stated they would be hiring those workers who were the best workers, responsible workers."); *id.* (Mr. Campos began to tell the workers the benefits of also bringing in workers from Mexico.  He said that by doing so, the wages would increase for [the assembled U.S. workers]."); *id.* (WKI "let [the U.S. workers] know that WKI has a sister company in Mexico and they already have a thousand workers.  [Ninety-six] workers have the necessary paperwork in order to begin work [pursuant to the visa certification in SJR 268].  He let them know that right now, they are looking at 4 farms that need work [but] if they have families in Mexico, that perhaps in the future [WKI] can help them get connected with work as well ...."); *see also* SJR 64-70 (Mr. Campos did not dispute the accuracy of his reported statements that he would provide work to those he considered the best workers); SJR 9 (WKI objective was always to provide more stable and reliable workers).

AA.  Barbara Lusinger is a TWC employee who has worked on thousands of H2A applications over thirty years.  SJR 153.  She has never seen demand for an H2A job from U.S. workers that surpassed the demand that U.S. workers expressed for WKI's posting.  SJR 164.

AB.  Between November 14 and 22, 2011, TWC and DOL officials repeatedly observed that Mr. Campos was attempting to deter U.S. workers from accepting the jobs.  They repeatedly warned him that he must hire all U.S. workers who applied prior to accessing H2A visas for Mexican workers.  SJR 143, 158-63, 178, 307, 312, 316.

AC.  WKI had no prospective jobs available to workers other than those referenced in its H2A application at SJR 237.  SJR 36-37.

AD.  On November 22, 2011, eleven days after writing that the labor shortage was an emergency, Mr. Campos wrote to DOL falsely claiming that a drought required him to cancel WKI's H2A application.  SJR 273.  Mr. Campos blamed the cancellation on CAB/CEI.  *Id.* ("Unfortunately the agricultural producers that WKI has contracted with to provide farm labor services have informed WKI that due to severe drought conditions at the places of employment, there is no work to be performed at this time."); SJR 72 (in November 2011, Mr. Campos called Dino Cervantes and informed him that "we understood if he had the same situation, we wouldn't do anything against him"); SJR 46-47, 377 ("After evaluating the weather conditions, we all together agreed that it was going to be unnecessary to have the extra workers ....").

AE.  Ronald Franzoy described Mr. Campos's drought claim as follows:

> That's a bunch of kahooey.  The reason that he [cancelled the H2A application is] because he wasn't able to get the people from Mexico in our agreement.  It had nothing to do with adverse [weather] conditions.  I had chile to pick that year, and I could have used the help and the labor.

SJR 134; *see also* SJR 61-62 (Mr. Campos's only explanation for how labor needs went from emergency to none in 11 days was ""It was a drought well known in the area--for a long time.").

AF.  Like Ronald Franzoy , Dino Cervantes also hired replacement workers to actually perform the work covered by the AOS that he signed with WKI.  Dino Cervantes's labor needs

and labor supply did not change between 2010 and 2012.  SJR 92, 193, 199; Doc. 186 at 2.  CAB actually paid its U.S. seasonal laborers hourly minimum wage of $7.50 per hour during 2011 and 2012.  SJR 86-87, 193-94, 197.

AG.  Neither WKI nor CAB provided any work to Plaintiffs during the period for which Plaintiffs were hired pursuant to the terms of WKI's H2A contract.  SJR 143-44, 404-11; Doc. 186-5 at 3.  Plaintiffs attempted to find substitute work during this period with limited and varying success.  *Id.*; Doc. 186-4 at 5-7.

###    ii.    Plaintiffs Dispute the Following Assertions Made by CAB

1-CAB.  CAB claims that it "employs" farm labor "contractors" in the plural.  Actually at least since 2009 CAB has employed only one farm labor contractor named Jesus Maldonado, and he has worked for CAB for 40 years.  SJR 191, 206.  Employment of but one contractor shows that when CAB contracted with WKI, CAB already had a simple, reliable source of U.S. labor at its disposal, and one that had performed to CAB's satisfaction for decades.  SJR 191, 197, 199.

3-CAB.  Dino Cervantes agreed to meet Jaime Campos prior to September 10, 2011, proving more than one conversation between them.  SJR 77.  These two men either discussed the WKI contract prior to September 10, or after September 10, or both.  This is proved by the fact that terms of their contract are type-written, including the number of workers, date of work, and type of work.  SJR 225.  At the September 10 meeting, Jaime Campos did not have a machine with him capable of producing a type-written document.  SJR 88-89.  So the terms either had to have been negotiated prior to September 10 and Mr. Campos brought SJR 225 with him to the meeting, or the terms had to have been negotiated at the September 10 meeting, and then set forth in writing for Dino Cervantes's later signature.  Either way, WKI's AOS was brought to Dino Cervantes's attention on at least two separate occasions, and he had an opportunity to

consider the specific typewritten terms at least twice. The record also contains evidence of a subsequent communication between WKI and CAB/CEI in November 2011 at the time that WKI cancelled its H2A contract. SJR 71-72, 273.

4-CAB. The "farm office" where Dino Cervantes met Jaime Campos is actually the dry chile processing factory where CEI conducts business in Vado, NM, and not the separate office where CAB conducts business in La Mesa, NM. SJR 78, 225.

7-CAB. The following record evidence shows that a genuine dispute prevents summary judgment as to whether Dino Cervantes signed SJR 225 on behalf of CAB, CEI, or both. SJR 45, 70, 72, 76-78, 90, 194, 196, 202, 260, 343-76. Plaintiffs discuss this evidence in Part I.A., *infra*. CAB claims that SJR 225 "identifies only Cervantes Agribusiness" and contains "no reference" to CEI. Doc. 185 at 4-5. To the contrary, SJR 225 references *only* CEI's address and telephone number in Vado, New Mexico, and not CAB's separate address and telephone number in La Mesa, New Mexico. SJR 78. This Agreement states "Processing & Packing: Dry Red Chile & Other Spices" as the only work to be performed. SJR 225. This is another "reference," for only CEI processes dry red chile, and CAB does not. SJR 89; Doc. 185-2 at 1. Also Mr. Campos testified that he listed "Cervantes Enterprises" on WKI's H2A application, *see* SJR 237, to fulfill his obligation under the AOS that Dino Cervantes signed. SJR 60.

8-CAB. Plaintiffs agree that no direct communication occurred, but they assert that indirect communication occurred through WKI's H2A application, SJR 228-37 and 281-87.

9-CAB. The following record evidence shows that a genuine dispute prevents summary judgment as to whether WKI acted as recruiting agent for CAB/CEI. SJR 7, 10-16, 22-26, 34-37, 60, 78-80, 92, 118, 124, 131-33, 225-26, 387. Plaintiffs discuss this evidence in Part II, *infra*.

10-CAB. This allegation repeats Assertion 9-CAB. Plaintiffs enter the same response.

12

12-CAB.  The record shows that when Dino Cervantes signed SJR 225, he knew that Jaime Campos needed and would use SJR 225 to apply to the government for H2A workers.  SJR 13, 34-35, 37, 60, 78-80.

17-CAB.  The following record evidence shows that a genuine dispute prevents summary judgment as to whether a conspiracy existed between CAB/CAI and WKI.  SJR 11-15, 23-25, 35-37, 57, 71-72, 77-82, 85, 88-89, 108, 131, 134, 191-201, 217-18, 225, 273, 377, 391-94. Plaintiffs discuss this evidence in Part V, *infra*.

18-CAB.  Plaintiffs dispute this assertion for four reasons.  (a) Dino Cervantes testified that he could not remember every communication with Jaime Campos regarding SJR 225, and he had no way of refreshing his recollection as to whether he did.  SJR 77-78, 213.  When Plaintiffs' counsel continued to probe, defense counsel directed Dino Cervantes not to answer further questions about Dino Cervantes's communications with WKI and Jaime Campos.  SJR 82-83. Consequently the record only establishes that Dino Cervantes remembers but one conversation about SJR 225, not that conversation was limited to one on September 10, 2011.   (b) The typewritten form of the text in SJR 225 proves that Dino Cervantes considered this text on at least two separate occasions, as described in response to Assertion 3-CAB, *supra*.  (c) The content of the text of SJR 225 is itself evidence of a subsequent meeting because it commits WKI to supply a specific number of workers on a specific date.  A jury is entitled to read SJR 225 by itself to establish a reasonable likelihood that the parties to this contract would make some future arrangements as to these workers prior to November 10, 2011, whether to cancel them, postpone their arrival, or plan for how they would be supervised.   And indeed, Jaime Campos claims that he did speak with a CAB/CEI employee about the H2A contract in November 2011.  SJR 71-72, 273, 377.  Dino Cervantes and Jaime Campos could always reach one another, and Mr. Campos

13

claims to have done everything "humanly possible" to avoid cancelling his CAB/CEI contract.
SJR 47-48, 87.  (d) Finally, on February 7, 2012, while Dino Cervantes had replacement workers
performing the work that CAB/CEI had contracted to WKI in SJR 225, Dino Cervantes and
Jaime Campos were both listed speakers at the New Mexico Chile Conference.  SJR 394.  Mr.
Campos saw Dino Cervantes listed on the agenda, but does not remember talking to him that day.
SJR 70-71.  Mr. Campos's February 7 presentation consisted of promoting WKI's H2A recruiting
plan, and he remembers being questioned by audience members, SJR 70, so he could not help
having brought to mind his failed experience with Dino Cervantes only two months before.

19-CAB.  The parties agree that CAB relied on its only farm labor contractor, Jesus
Maldonado, to perform the work covered by SJR 225 between November 2011 and March 2012.
In fact, Mr. Maldonado has done all of the farm labor contracting for CAB at least since 2009,
and has supervised the seasonal work needed by Dino Cervantes for some 40 years to Dino
Cervantes's satisfaction.  SJR 191, 197, 206.  Dino Cervantes never gave Jesus Maldonado any
indication that his work would ever be changed in 2011-2012.  SJR 199.  Based on the record
cites provided in paragraphs 17-CAB and 18-CAB above, however, Plaintiffs dispute any
implication that the reason CAB hired Mr. Maldonado in 2011-2012 was because CAB "hear[d]
nothing more from WKI and Mr. Campos."

### iii.    Plaintiffs Dispute the Following Assertions Made by CEI

1-CEI.  On October 27, 2011 Mr. Campos, presumably after consulting with Dino
Cervantes, swore to DOL that CEI is a farm operator and owner that produces agricultural
commodities aside from its packing services.  SJR 260.  Dino Cervantes signed many farm labor
time sheets under CEI's name within 2010-2013 time period.  *See, e.g.,* SJR 353, 355, 372.  CEI
purchases "chile plugs" which are necessary for farming and not for processing chile.  SJR 344.

14

3-CEI.  Plaintiffs repeat their response as to Assertion 1-CAB, *supra.*

4-CEI.  Plaintiffs repeat their response as to Assertion 3-CAB, *supra.*

5-CEI.  Plaintiffs repeat their response as to Assertion 4-CAB, *supra.*

8-CEI.  Plaintiffs repeat their response as to Assertion 7-CAB, *supra.*

9-CEI.  Plaintiffs repeat their response as to Assertion 7-CAB, *supra.*

10-CEI.  Plaintiffs repeat their response as to Assertion 8-CAB, *supra.*

11-CEI.  Plaintiffs repeat their response as to Assertion 9-CAB, *supra.*

12-CEI.  Plaintiffs repeat their response as to Assertion 9-CAB, *supra.*

17-CEI.  Plaintiffs repeat their response as to Assertion 17-CAB, *supra.*

18-CEI.  Whether CEI hires seasonal "farm" workers is disputed for the reasons stated as to Assertion 1-CEI, *supra.*  Moreover, CEI does hire seasonal agricultural workers to pack dry chile.  SJR 88; *see also* n.11, *infra* (describing why CEI is an "agricultural employer" under 29 U.S.C. § 1802(2)).  The contract that Dino Cervantes signed covers only "Processing & Packing: Dry Red Chile."  SJR 225.  WKI argues that "Plaintiffs work performing farm field work [so] there is no reason [CEI] would have ever hired Plaintiffs."  Doc. 186 at 6.  But the work contract offered to Plaintiffs plainly includes "packing and loading harvest products" as work to be performed under WKI's H2A application.  SJR 230.  By accepting this work, Plaintiffs showed that they are not limited to performing farm field work.  SJR 404-11; Doc. 186-4 at 2; Doc. 186-5 at 4.  No evidence supports CEI's contrary assertion.

19-CEI.  Plaintiffs repeat their response as to Assertion 19-CAB, *supra.*

## STANDARD OF REVIEW

A motion for summary judgment must be denied if, under the evidence, reasonable people may reach different conclusions as to a claim or defense.  *Anderson v. Liberty Lobby, Inc.*,

15

477 U.S. 242, 248 (1986). Summary judgment "should not be entered unless the movant has

established its right to a judgment with such clarity as to leave no room for controversy and

unless the other party is not entitled to recover under any discernible circumstances."

*Teleconnect v. Ensrud*, 55 F.3d 357, 359 (8th Cir. 1995). The nonmoving party may draw upon

inferences from circumstantial evidence to defeat summary judgment. *Trujillo v. PacifiCorp*,

524 F.3d 1149, 1155-56 (10th Cir. 2008); *Ortiz v. Norton*, 254 F.3d 889, 893 (10th Cir. 2001).

## ARGUMENT

None of the undisputed facts cited by CAB or CEI entitles either to summary judgment

on any claim, and both CAB and CEI ignore many disputed and undisputed facts that preclude

summary judgment. CAB and CEI present virtually the same summary judgment arguments in

the same five subsections. Docs. 185 and 186. For ease of reference, Plaintiffs respond in the

same order that Defendants present their arguments.[3]

## I.     CAB/CEI CONTRACTED WITH WKI TO RECRUIT AGRICULTURAL LABOR

Dino Cervantes manages both CAB and CEI. SJR 76. He admits that he signed an

Agreement of Outsourcing Support ("AOS") with WKI, and did so to access H2A workers. SJR

76, 78-82. WKI needed and used this AOS to file its H2A application. SJR 60. The AOS bears

only CAB's name and the H2A application bears only CEI's name. SJR 225, 237, 285. Now

CAB points to the absence of its name on the H2A application and claims that it cannot be liable.

---

[3] The five headings into which CAB and CEI divide their summary judgment arguments do not track the five causes of action that Plaintiffs assert against these Defendants in Doc. 103. Instead, under their first heading, CAB and CEI assert global facts that they claim undermine all of Plaintiffs' claims. Their second and third headings pertain to Plaintiffs' breach of contract claims in Doc. 103 ¶¶ 156-63. Their fourth heading pertains to Plaintiffs' claims for fraud in Doc. 103 at ¶¶ 172-81 and violation of the Agricultural Worker Protection Act (AWPA), 29 U.S.C. §§ 1801, *et seq*. in Doc. 103 at ¶¶ 137-45. And their fifth heading pertains to Plaintiffs' civil conspiracy claim in Doc. 103 at ¶ 150-52.

CEI similarly points to the absence of its name on the AOS and claims that it cannot be liable. CAB/CEI's shell game cannot produce summary judgment for either party.

> **A.   Record Evidence Proves a Genuine Dispute as to Whether Dino Cervantes Signed the AOS for CAB, CEI, or Both**

CEI argues that it cannot be liable under any cause of action asserted by Plaintiffs because SJR 225 bears CAB's name and not CEI's.  Doc. 186 at 6.  But SJR 225 also bears only CEI's address and telephone number, not CAB's separate address and separate telephone number.  SJR 78.  Also, SJR 225 states that the workers hired pursuant to it will perform the following work: "Processing & Packing: Dry Red Chile & Other Spices."  Only CEI performs this packing and processing work, CAB does not.  SJR 76, 90, 202; Doc. 185-2 at 1.  Mr. Campos understood that when he sought H2A workers for Dino Cervantes, he was doing so on behalf of CEI, at least in part, because Dino Cervantes gave him CEI's business card.  SJR 45; *see also* SJR 70, 72 (Dino Cervantes did not inform Mr. Campos how CAB is distinguished from CEI.).  Mr. Campos wrote to DOL that CEI includes both farming and packing operations.  SJR 260.  While Dino Cervantes now claims that CEI has not conducted farming operations for fifteen years, his initials appear on farm labor timesheets labeled "Cervantes Enterprises, Inc." from 2010 through 2013, *see, e.g.,* SJR 353, 372, and CEI has purchased thousands of chile plugs only useful to farm new crops, SJR 344.  Dino Cervantes uses CEI resources, including CEI email, to conduct CAB business, and was not sure himself whether he first learned of WKI's proposal in his capacity as manager for CAB or CEI.  SJR 76-77.  Dino  Cervantes has relied on but one farm labor contractor, Jesus Maldonado, for 40 years.  Mr. Maldonado testified that he does not know whether he is employed by CAB or CEI, and that he conducts payroll business at

CEI's office.  SJR 194-96, 202.  For any and all of these reasons, a jury must decide whether

Dino Cervantes signed SJR 225 on behalf of CAB, CEI, or both (CEI/CAB).[4]

> **B.  Record Evidence Proves a Genuine Dispute as to Whether SJR 225 is an Enforceable Contract**

CAB argues that it cannot be liable under any cause of action asserted by Plaintiffs

because SJR 225 is "not an enforceable contract" and instead "only a gratuitous expression of an

intention by [CAB] to hire WKI on the condition that WKI could provide seasonal farm laborers

to assist Cervantes Agribusiness with the chile harvest, between the specified dates."  Doc. 185 at

7-9.  "The existence of a contract ... is a question to be determined from all the facts in the case."

*Boggs v. Anderson*, 381 P.2d 419, 422 (N.M. 1963).  Here, the record viewed in the light most

favorable to Plaintiffs proves a genuine dispute as to whether a contract exists between CAB and

WKI because: (a) federal law required a WKI-CAB "work contract" as part of WKI's H2A

application, 20 C.F.R. § 655.132(b)(4); (b) CAB admits that it signed SJR 225 to enable WKI to

apply for H2A workers, SJR 13, 35, 60, 78-80; and (c) WKI  swore to the federal government

under penalty of perjury that an employment contract existed between CAB and WKI, SJR 236.

Even so, CAB argues that SJR 225 is not enforceable because: (a) it lacks language of

offer and acceptance; (b) it omits the "essential term" of the "consideration to be paid WKI upon

performance;" and (c) it is subject to unilateral modification or revocation.  Doc. 185 at 7-9.

Contrary to CAB's unsupported assertion, SJR 225 does contain language of offer and

acceptance, namely its first word "Agreement," specific dates of agreement and performance,

and language that is binding and mandatory.  For example, WKI "*will provide 15 farm workers*

---

[4] Even if, *arguendo*, Dino Cervantes intended to contract with WKI only on behalf of CAB and not on behalf of CEI, the jury may still deem CEI liable under a "single employer" theory.  The following factors are weighed to determine whether two related businesses should be liable as a single employer: "(1) the interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control." *Long v. Aronov Realty Mgt., Inc*., 645 F. Supp. 2d 1008, 1030 (M.D. Ala. 2009) (collecting cases).

on a daily basis for the length of this agreement.  WKI *will be responsible to pay* each worker for the services rendered."  *Id.* (emphasis added).

The AOS necessarily infers that CAB/CEI will pay WKI money.  SJR 225 ("WKI will be responsible to pay each worker for the services rendered [to CAB/CEI].").  CAB correctly observes that SJR 225 is entirely silent on how much money CAB agreed to pay WKI.  However, absence of a compensation term within the text of a written contract does not mean that the parties did not agree to this term.  *See McCasland v. Prather*, 585 P.2d 336, 340 (N.M. App. 1978) (contract enforceable without compensation term).[5]  It only means that the parties deliberately declined to make a written record of that part of their agreement.  A grower identically situated with CAB testified that, under the very same H2A application supported by CAB/CEI, Ronald Franzoy and WKI planned to pay Mexican H2A workers only New Mexico's minimum wage rate of $7.50 per hour, and not the $9.71 per hour required by federal law and promised in WKI's H2A application.  SJR 131.[6]  CAB historically paid New Mexico's minimum wage of $7.50 for each hour of work performed by its seasonal workers.  SJR 193-94.  CAB

---

[5] Also, H2A law specifying the $9.71 wage rate and binding CAB/CEI to WKI in a "work contract"—*see* 20 C.F.R. § 655.132(a)-(b)(4)—may be automatically incorporated into SJR 225 regardless of whether WKI and CAB/CEI ever discussed these terms.  *Bernalillo County Sheriffs Ass'n v. County of Bernalillo*, 845 P.2d 789, 793 (1992); *State ex rel. Udall v. Colonial Penn. Ins. Co.*, 812 P.2d 777, 784 (N.M. 1991); *see also Farmers and Merchants Bank of Monroe v. Federal Reserve Bank of Richmond*, 262 U.S. 649, 660 (1923) ("Laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms.  This principle embraces alike those laws which affect its construction and those which affect its enforcement or discharge.").

[6] Mr. Campos is not alone in being accused of blatantly lying on federal applications to access foreign workers.  Even large multinational corporations have been accused of blatant wage fraud on their applications to bring foreign laborers into New Mexico.  *See Schlumberger Ltd., et al. v. Asmoro, et al.*, No. 10-cv-1235, 2010 WL 10900249 at *1 (D.N.M. Dec. 23, 2010).  Similar cases appear of record nationwide.  *See, e.g., Casares v. Agri-Placements Int'l, Inc.*, 12 F. Supp. 3d 956, 963 (S.D. Tex. 2014); *David v. Signal Int'l, LLC*, No. 08-cv-1220, 2012 WL 10759668 at *24 (E.D. La. Jan. 4, 2012); *Marquis v. U.S. Sugar Corp.*, 652 F. Supp. 598, 599-600 (S.D. Fla. 1987).  Worker advocates point to lax investigation and enforcement by the U.S. Department of Labor as a reason for employer abuse of existing foreign guest worker laws.  *See, e.g., Mendoza v. Perez*, 754 F.3d 1002, 1007 (D.C. Cir. 2014); SOUTHERN POVERTY LAW CENTER, CLOSE TO SLAVERY—GUESTWORKER PROGRAMS IN THE UNITED STATES at 38 (2013) (available at https://www.splcenter.org/20130218/close-slavery-guestworker-programs-united-states).

never had difficulty finding sufficient numbers of seasonal workers by paying minimum wage. SJR 199.  Dino Cervantes testified that he never made any wage-rate agreement with Jaime Campos.  SJR 80; Doc. 185 at 9.  But Jaime Campos testified otherwise.  Jaime Campos testified that Dino Cervantes agreed that CAB would pay the workers supplied by WKI the extraordinarily high adverse effect wage rate of $9.71 per hour plus $1 per hour for WKI's expenses and profits.  SJR 17, 36.  Jaime Campos had to testify this way, because he swore to the federal government under penalty of perjury that in September 2011, WKI had executed agreements guaranteeing that the workers would be paid at least $9.71 per hour.  SJR 236.  Mr. Campos's testimony alone, and certainly all of these record facts together, show a genuine dispute as to whether CAB and WKI in fact agreed as to what rate would be used for CAB to compensate WKI.  Whether CAB and WKI agreed to the same $7.50 rate admitted by Ronald Franzoy, or to the $9.71 rate claimed by Jaime Campos, is a question for the jury.

Finally, CAB points to no text in SJR 225, or any other evidence, that makes this agreement subject to unilateral modification or revocation.  To the contrary, the text "contractually forbidden" undermines any argument that the parties contemplated unilateral changes.  On its face, SJR 225 is exactly what WKI used it for under federal law: a "work contract."  20 C.F.R. § 655.132(b)(4); *accord* SJR 13, 34-35, 37, 60.

### C.    Plaintiffs Had No Direct Contact with CAB/CEI, But This Does Not Absolve CAB/CEI of Liability

CAB and CEI repeatedly argue that neither can be liable on any claim asserted by Plaintiffs because neither had any direct contact with Plaintiffs.  Plaintiffs do not dispute this fact, but it does not absolve any Defendant of liability.  The contract that WKI used to recruit Plaintiffs names CAB/CEI as one of four growers for whom Plaintiffs were to work, contained a

20

map to CAB/CEI and a description of the work that Plaintiffs were to perform at CAB/CEI.  SJR

281-87.[7]   The fact that CAB/CEI communicated with Plaintiffs exclusively through WKI does

not undermine any of the five causes of action that Plaintiffs assert, as established by the

authority cited in Parts 2-5, *infra*.  Indeed, Congress enacted the Agricultural Worker Protection

Act (AWPA), 29 U.S.C. § 1801, *et seq.*, precisely because growers routinely hire agricultural

labor through intermediaries in attempts to insulate themselves from liability for mistreatment of

these vulnerable workers.  *See Charles v. Burton*, 169 F.3d 1322, 1344 (11th Cir.); *Flores v. Rios*,

36 F.3d 507, 510 (6th Cir.1994); H.R. Rep. No. 97-855, *reprinted in* 1982 U.S.C.C.A.N. 4547,

4552-54 ("Even if a farm labor contractor is found to be a bona fide independent contractor, ...

this status does not as a matter of law negate the possibility that an agricultural employer or

association may be a joint employer of the harvest workers and jointly responsible for the

contractor's employees.").[8]

---

[7] SJR 281-87 alone proves a genuine dispute as to Defendants' claim that:

> At their depositions Plaintiffs uniformly testified they had no idea who Cervantes Agribusiness is, where it is located, or what business it is in.  All Plaintiffs conceded that they were never told they would be employed [by] Cervantes Agribusiness.  [Plaintiffs' Depositions; Exhs. 4, 5, 6, 7, 8, 9, 10, 11, and 12].  Plaintiffs consistently testified they had never even heard the name Cervantes Agribusiness.  [Id.].

Doc. 185 at 6-7; *see also* Doc. 186 at 6-7 (same).  These assertions are also contradicted by Plaintiffs' deposition testimony.  *See, e.g.,* Doc. 186-4 at 2 (Esteban Alfaro-Huitron); Doc. 186-5 at 2 (Juan Guzman).  However, Plaintiffs agree that WKI never designated which of the four farms listed in SJR 285 would employ each Plaintiff at which times during the contract period, as Plaintiffs discuss in Part II, *infra*.  *See* Doc. 186-4 at 2 ("we would go to work at several, several parts with several ranchers").

[8] AWPA joint employment is determined by the "economic reality test," which makes a worker the employee of every person who has practical economic control over the worker's performance.  Farm laborers are commonly held to be jointly employed by their farm labor contractors (*i.e.* WKI), and the farms where they are contracted to work (i.e. CAB/CEI).  *See, e.g., Chevron Oil Co. v. Sutton*, 515 P.2d 1283, 1286 (N.M. 1973); *Antuñez v. G & C Farms, Inc.*, No. 92-cv-308, 1993 WL 451344 at *3 (D.N.M. Aug. 9, 1993); *Fanette v. Steven Davis Farms, LLC*, 28 F. Supp. 3d 1243, 1256 (N.D. Fla. 2014).  Here, WKI had absolutely no experience or assets, so it was entirely economically dependent on growers including CAB, rendering CAB the joint employer of those hired by WKI, including Plaintiffs.  *See Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1327-28 (5th Cir. 1985).

## II.   RECORD EVIDENCE PROVES A GENUINE DISPUTE AS TO WHETHER WKI ACTED AS CAB/CEI'S AGENT IN HIRING PLAINTIFFS

The evidence establishes a genuine issue of material fact as to whether CAB/CEI is liable for breach of SJR 281-87 because WKI was acting as agent for CAB/CEI when WKI made this contract with Plaintiffs.  *See Romero v. Mervyn's*, 784 P.2d 992, 996 (N.M. 1989) (principal is liable on contract made by agent with actual or apparent authority); SJR 153-54 (DOL Form ETA-790, SJR 281-87, is provided to workers as their written contract.).

When a grower hires a contractor to recruit labor, their relationship is generally regarded as one of agency.  "[I]t is hard to conjecture any circumstance in which the contractor would not be the 'agent,' for at least some purposes, of a farmer who communicated with him in advance to recruit labor."  *Beliz*, 765 F.2d at 1334.  WKI advertised itself as a farm labor recruiting agency. SJR 7, 10, 387.  CAB/CEI signed an agreement authorizing WKI to "recruit workers on its behalf."  SJR 225; Doc. 186-5 at 2.  Even so, CAB/CEI argue that no evidence shows that WKI recruited Plaintiffs as their agent.  Doc. 185 at 12-14; Doc. 186 at 8-11.

CAB/CEI present three arguments for summary judgment on Plaintiffs' agency claim. First, they argue that they never authorized WKI to file an H2A application.  *See* Doc. 185 at 10 ("[T]here is no evidence that [CAB] had anything to do with either [WKI's] H2A application [SJR 228-37] or the DOL Clearance Order [SJR 281-87].  CAB never saw [these documents], and had nothing whatsoever to do with [their] preparation or submittal.").  But Dino Cervantes and Jaime Campos have both already testified that CAB/CEI signed SJR 225 specifically to facilitate WKI's H2A application.  SJR 13, 34-35, 37, 60, 78-80.  Federal law even required WKI to secure CAB/CEI's consent to SJR 225 as a condition of filing its H2A application.  *See* 20 C.F.R. § 655.132(a) (An H2A application filed by an "H-2ALC [or H2A Labor Contractor, *see*

22

*id.* at § 655.103] must be limited to a single area of intended employment in which the fixed-site employer(s) to whom an H-2ALC is furnishing employees will be utilizing the employees."); *id.* at 655.132(b)(4) (a "work contract" is required from each fixed-site employer).  Therefore, contrary to CAB/CEI's bald assertion, the evidence viewed in the light most favorable to Plaintiffs proves a fact issue as to whether CAB/CEI authorized WKI's H2A application.

Second, CAB/CEI argue that because WKI never told any Plaintiff that he would work specifically at CAB/CEI rather than one of the other three fixed-site employers listed in WKI's H2A application (including current defaulted Defendant Tierra de Dios Farms and former Defendants RJF Farms and Rio Valley Chile), WKI could not have recruited Plaintiffs as CAB/CEI's agent.  Doc. 185 at 12; Doc. 186 at 17.  But settled law establishes that a person may simultaneously serve as agent for more than one principal.  *Innotext, Inc. v. Petra'Lex USA Inc.*, 694 F.3d 581, 590 (6th Cir. 2012); *Finnerman v. McCormich*, 499 F.2d 212, 215 (10th Cir. 1974); RESTATEMENT (SECOND) OF AGENCY § 226 (1977).  Until WKI assigned a Plaintiff to a particular fixed-site employer, WKI conducted recruiting activities for all of its principals together, including CAB/CEI, and all are jointly and severally liable for WKI's conduct within the scope of its authority.  *Id.*[9]

Third, CAB/CEI argue that they exercised insufficient control over WKI to invoke a principal-agent relationship.  The parties agree that "[t]he degree of control giving rise to liability depends on the particular facts of each case" regardless of how the parties themselves define

_____

[9] AWPA also made WKI responsible for disclosing to each Plaintiff exactly where he would work at the time of hiring.  *See Villalobos v. N. Carolina Growers Ass'n, Inc.*, 252 F. Supp. 2d 1, 10 (D.P.R. 2002); *Vega v. Nourse Farms, Inc.*, 62 F. Supp. 2d 334, 346 (D. Mass. 1999).  WKI's violation of this requirement only underscores WKI's intent to provide work to Mexican workers, and its intent to deny work to U.S. workers including Plaintiffs, as discussed in Parts 4 and 5, *infra*.  Moreover, AWPA imposes a direct obligation on CAB/CEI to ensure that each Plaintiff was notified of exactly where each Plaintiff would work.  *See* Part IV, *infra* (discussing *Escobar v. Baker*, 814 F. Supp. 1491, 1502-03 (W.D. Wash. 1993)).

their relationship.  *Estate of Anderson v. Denny's, Inc.*, 987 F. Supp. 2d 1113, 1149 (D.N.M. 2013); Doc. 185 at 11-12.  "Although control or right to control the physical conduct of the person giving service is important and in many situations is determinative, the control or right to control needed to establish the relation of master and servant may be very attenuated.  In some cases which involve persons customarily considered as servants, there may even be an understanding that the employer shall not exercise control."  *McCauley v. Ray*, 453 P.2d 192, 201 (N.M. 1968); *accord* RESTATEMENT (THIRD) OF AGENCY § 1.01 cmt. f ("A principal's control over an agent will as a practical matter be incomplete because no agent is an automaton who mindlessly but perfectly executes commands."); RESTATEMENT (SECOND) OF AGENCY § 14 cmt. a ("The control of the principal does not, however, include control at every moment; its exercise may be very attenuated and, as where the principal is physically absent, may be ineffective."). Importantly, the "right" to control is dispositive of agency regardless of whether the right to control is actually ever exercised.  *Celaya v. Hall*, 85 P.3d 239, 242-43 (N.M. 2004); *McCauley*, 453 P.2d at 201; *accord Segura v. Colombe*, 895 F. Supp. 2d 1141, 1150 (D.N.M. 2012) ("The inquiry again rests on agency principles.  Specifically, a court must determine whether the governmental entity had the legal right to supervise or control the public employee, regardless of whether the entity actually exercised that control.").

The summary judgment record is replete with evidence demonstrating a fact issue as to whether CAB/CEI exercised sufficient control over WKI that a jury should decide whether WKI recruited Plaintiffs as CAB/CEI's agent:

(a) Ronald Franzoy—a grower who signed the same AOS that CAB/CEI signed to support the same H2A application, SJR 225-26—admitted that he retained complete control over how WKI recruited workers under the AOS.  SJR 118, 133.  He even exercised that control,

demanding that WKI only recruit laborers willing to be trained and certified in "GAP" standards. SJR 24, 124.  WKI complied.  *Id.*  While this is direct evidence of agency as to RJF Farms, it is also circumstantial evidence as to CAB/CEI because Mr. Campos testified that he treated all of the growers the same when it came to recruiting control, including CAB/CEI.  SJR 15, 26, 34, 36.  The record indicates no reason why WKI would allow growers different degrees of control over his recruiting activities.

(b) Mr. Campos testified that he always recruited in the "best interest" of the growers, and he never did anything inconsistent with their wishes.  SJR 23 ("Q.  If they would have told you, 'We want you to go to New Mexico ...' would you have done it?  A.  It's a customer.  How could you say no?  Of course we said yes."); SJR 47 (do things "the way the farmers wanted").

(c) Dino Cervantes admits that his sole objective in contracting with WKI was to secure workers under the federal H2A program.  SJR 78-80.  He understood that under this contract, WKI would to recruit in accord with all H2A regulations.  SJR 92.  H2A includes extensive and detailed recruiting requirements for both U.S. and foreign workers.  *See, e.g*., 20 C.F.R. Ch. V, Pt. 655, Subpt. B.  Mr. Campos testified that in fact, H2A regulations completely controlled WKI's recruiting.  SJR 37.  Thus, CAB/CEI controlled all WKI recruiting by stipulating that it would be done in pursuant to H2A regulation.

(d) WKI knew nothing about the actual practice of agricultural labor, and lacked any capacity to actually supervise farm workers as they did their jobs.  SJR 11-12, 25, 93, 131. Consequently CAB/CEI, and not WKI, would have to supervise all workers hired pursuant to WKI's H2A application.  From this, a jury can reasonably deduce that CAB/CEI would want some say in the quality of the employees they will have to supervise.  SJR 22 (WKI expected to comply with grower demands that any worker be replaced). This indicates control over which

25

workers would be recruited in the first place.

(e) WKI was thoroughly dependent upon satisfying the four fixed-site employers listed on its H2A application.  At the time WKI had no assets, experience, or other customers.  SJR 14, 23-25, 36, 131.  Mr. Campos convinced the Growers to go along with WKI's H2A plan as "guinea pigs," and he meant to do what the Growers wanted as a means of building a presence in Southern New Mexico.  SJR 16, 23.  WKI had no ability to make any payroll without the four growers listed on its H2A application, and had no work to provide anyone except that listed on its H2A application.  SJR 14, 22-23, 36-37.  WKI did not decide when, what, or where work would be done.  *Id.*  The "economic reality" of WKI's relationship with the growers was one of utter dependence.  *Harger v. Structural Services, Inc.*, 916 P.2d 1324, 1331 (N.M. 1996) ("economic reality" test determinative of right to control for purposes of agency determination).

These record facts would allow a jury to reasonably conclude that as a matter of practical and economic reality, CAB/CEI controlled WKI's performance of SJR 225 regardless of whether CAB/CEI ever exercised that control.  "Courts have recognized that agricultural employers retain the ability to exercise significant control over the employment but may never find the need to exercise that power.  The retention of power is revealing of the economic dependence of the workers on the putative employer just as is the actual exercise of power."  U.S. DEPT. OF LABOR, *Report Adopting AWPA Regulations*, 62 FED. REG. 11734, 11740 (Mar. 12, 1997) (*citing Beliz*, 765 F.2d at 1322-28; *Maldonado v. Lucca*, 629 F. Supp. 483, 487 (D.N.J. 1986)).

## III.  RECORD EVIDENCE PROVES A GENUINE DISPUTE AS TO WHETHER PLAINTIFFS WERE THIRD-PARTY BENEFICIARIES OF SJR 225

One of Plaintiffs' alternative theories of liability is that CAB/CEI breached SJR 225, its contract with WKI, and is liable to Plaintiffs who are third party beneficiaries of this contract.

Plaintiffs were third-party beneficiaries of each AOS because all parties to each AOS knew that each AOS would have provided a pecuniary benefit to a class of farm laborers that included Plaintiffs. *See Flores v. Baca*, 871 P.2d 962, 966 (N.M. 1994); *Stotlar v. Hester*, 582 P.2d 403, 407 (N.M. App. 1978). Although this claim may not be Plaintiffs' strongest, it survives summary judgment under New Mexico law and deserves the jury's consideration as one possible explanation of the record facts.

CAB/CEI argues that: (a) no evidence indicates that WKI and CAB intended Plaintiffs to be third-party beneficiaries of the contract that appears in SJR 225; and (b) even if sufficient evidence of intent exits, CAB never breached its contract with WKI and therefore owes no damages to any third-party beneficiary. Doc. 185 at 12-14.

First, Dino Cervantes himself suggests that he signed SJR 225 as a favor to Jaime Campos, to enable him to begin his H2A business. SJR 77, 79. Dino Cervantes knew that this favor may not have helped CAB/CEI at all. SJR 85. But of course businesses may well act for reasons other than self-interest, particularly family-owned businesses like CAB/CEI. If CAB contracted with WKI as a favor to Mr. Campos and did so actually expecting that WKI would comply with all federal H2A law as Dino Cervantes testified, SJR 92, then CAB necessarily also intended to benefit WKI's workers who would be paid well above what CAB ordinarily paid workers to perform the same labor. Jaime Campos made this point explicitly when he told U.S. workers, including Plaintiffs, that they "needed" Mexican workers to be included so that all would earn the higher H2A wage. SJR 333. Ronald Franzoy expressed his intent to benefit workers under his contract with WKI, SJR 122, 138, which is circumstantial evidence of CEI/CAB's intent where Dino Cervantes acknowledged that he did not know if SJR 225 would help CAB and could not state a clear reason for signing it. SJR 79-80, 85.

27

Second, sufficient evidence establishes that CAB/CEI breached SJR 225.  Mr. Campos testified that he called Dino Cervantes to assure him that even if CAB/CEI did not accept any workers under the AOS, then WKI would not attempt to hold Dino Cervantes liable.  SJR 72 ("we understood if [CAB/CEI also had drought], that we wouldn't do anything against him, just if he had to terminate it, we were in agreement.").  This proves that at the time, even Mr. Campos believed that CAB/CEI was obligated to accept workers as agreed in SJR 225.  The fact that WKI declined to hold CAB accountable for its breach says nothing about whether Plaintiffs may do so as third-party beneficiaries.

## IV.   RECORD EVIDENCE PROVES GENUINE DISPUTES THAT PREVENT ANY SUMMARY JUDGMENT ON PLAINTIFFS' FRAUD AND AWPA CLAIMS

CAB/CEI argue that Plaintiffs' fraud claims overlap with their AWPA claims, Doc. 185 at 14-16 and Doc. 186 at 12-15, but the two require separate analysis as follows.

### A.   CAB/CEI's Misrepresentations are No Less Fraudulent Because WKI Communicated the Misrepresentations to Plaintiffs

In common law, "'fraud' connotes deception or trickery generally."  *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016).  New Mexico courts explain that "the injured party [must] show that the other party (a) made a misrepresentation of fact intentionally or with reckless disregard for the truth, (b) with the intent to deceive and to induce the injured party to act upon it, (c) and upon which the injured party actually and detrimentally relies."  *Saylor v. Valles*, 63 P.3d 1152, 1158 (N.M. App. 2002).  CAB/CEI make four arguments for why they claim that Plaintiffs have insufficient proof of elements (a) and (b).

First, CAB/CEI claim that they made no misrepresentation of fact.  The record, however, provides conflicting evidence on this point.  Dino Cervantes admits that he signed SJR 225 to facilitate WKI's H2A application.  SJR 78-80.  Indeed, federal law required CAB/CEI to sign

28

SJR 225 as a condition of WKI's H2A application.  20 C.F.R. § 655.132(a)-(b)(4).  Because federal law required the representations that CAB/CEI made to the federal government through WKI, they were incorporated into Plaintiffs' employment contracts as a matter of law.  *Cuellar-Aguilar v. Deggeller Attractions, Inc.*, 812 F.3d 614, 619-20 (8th Cir. 2015); *Frederick County Fruit Growers Assn. v. Martin*, 968 F.2d 1265, 1268 (D.C. Cir. 1992); *Salazar v. Presidio Valley Farmers Assn.*, 765 F.2d 1334, 1342 (5th Cir. 1985).  So when CAB/CEI deliberately attempted to access H2A workers by knowingly facilitating WKI's H2A application, CAB/CEI knew or should have known that their actions would cause the following representations to be made to workers: (a) CAB/CEI lacked access to sufficient U.S. workers; (b) CAB/CEI would prefer U.S. workers prior to providing work to foreign workers; and (c) CAB/CEI would pay at least $9.71 per hour for all work performed by U.S. and foreign workers hired under the H2A application.  SJR 228-37.[10]  All three representations were false, for at all times: (a) CAB/CEI had access to all of the U.S. workers that they wanted, SJR 191, 194-97, 199, 201; (b) CAB/CEI hired WKI specifically to access Mexican workers and not U.S. workers, SJR 79-80, 82; and (c) CAB/CEI never agreed to pay more than minimum hourly wage of $7.50, SJR 80, 193-94.

Second, CAB/CEI argue that they never communicated directly with Plaintiffs, nor did they authorize WKI to communicate with Plaintiffs as their agent.  Whether WKI communicated with Plaintiffs as CAB/CEI's agent is genuinely disputed for the reasons stated in Part II, *supra*.

---

[10] When Dino Cervantes signed SJR 225, he actually knew that "there had to be some determination that they were needed for the job that [WKI] was bringing them in for" and that the workers would have to be paid the Adverse Effect Wage Rate.  SJR 80.  CAB/CEI have never argued that Dino Cervantes did not know the basic requirements of H2A law.  They cannot usefully make this argument because even if they did not know, they should have known. Joseph Cervantes is a part-owner of CAB and CEI, is Dino Cervantes's brother, and is a lawyer.  SJR 50, 213.  Dino Cervantes himself has many years' experience operating both CAB and CEI, and is a recognized leader in Southern New Mexico agriculture.  SJR 85, 391-94.  If CAB/CEI did not know the basic requirements of H2A law, they acted recklessly in signing SJR 225 without taking obvious, available steps to investigate those requirements, rendering summary judgment inappropriate.  *See Robertson v. Carmel Builders Real Est.*, 92 P.3d 653, 662 (N.M. App. 2003).

Even if, *arguendo*, WKI did not act as CAB/CEI's agent, no authority holds that an agency relationship is required to indirectly communicate fraudulent information.  Instead, any misrepresentations "made indirectly to an injured party can serve as the basis for an action for fraud ...."  *Gouveia v. Citicorp Pers.-to-Pers. Fin. Ctr., Inc.*, 686 P.2d 262, 267 (N.M. App. 1984) (citing RESTATEMENT (SECOND) OF TORTS § 531 (1977)).  "[S]ummary judgment as a matter of law [is] erroneous, notwithstanding the absence of direct contact between [the parties]."  *Id.*; *accord Lohman v. Daimler-Chrysler Corp.*, 166 P.3d 1091, 1096 (N.M. App. 2007) (misrepresentations communicated indirectly through a third party are actionable under New Mexico's Unfair Practices Act).  Here, as described in the previous paragraph, the summary judgment record shows a factual dispute as to CAB/CEI's knowledge, or reckless disregard for knowledge, about what representations WKI would make to Plaintiffs as required by federal law on the H2A application that CAB/CEI knowingly facilitated.

Third, CAB/CEI argue that they never knew Plaintiffs' identities prior to this lawsuit, so they could not have intended to deceive Plaintiffs.  But where a person has "reason to expect that his misrepresentation will reach any of a class of persons, although he does not know the identity of the person whom it will reach or indeed of any individual in the class," fraud liability still attaches.  RESTATEMENT (SECOND) OF TORTS § 531 cmt. c (1977); *accord Michael v. Shiley, Inc.*, 46 F.3d 1316, 1335 (3d Cir. 1995); *Issen v. GSC Enterprises, Inc.*, 538 F. Supp. 745, 751 n.10 (N.D. Ill. 1982); *Moore v. Altra Energy Techs.*, 321 S.W.3d 727, 736 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

Finally, CAB/CEI argue that their actual lack of desire for U.S. workers prevented them from intending to induce any U.S. workers to rely on any false statements.  But settled law establishes that to be liable for fraud, a person making misrepresentations need not actually

30

*desire* any person to detrimentally rely on the misrepresentations, and is liable as long as the

person reasonably *expects* a person to detrimentally rely on the misrepresentations. *See*

RESTATEMENT (SECOND) OF TORTS § 531 comment c (A result is intended if the actor either acts

with the desire to cause it[, and] one who believes that another is substantially certain to act in a

particular manner as a result of a misrepresentation intends that result, although he does not act

for the purpose of causing it and does not desire to do so."); *accord In re Mercer*, 246 F.3d 391,

410 (5th Cir. 2001); *Lopes v. Vieria*, No. 1:06-cv-01243, 2011 WL 1883157 at *33 (E.D. Cal.

May 17, 2011); *In re Chivers*, 275 B.R. 606, 621 (Bankr. D. Utah 2002). The summary

judgment record shows that CAB/CEI knowingly or recklessly permitted misrepresentations of a

job opportunity to be made to U.S. farmworkers when CAB/CEI at no time wanted U.S.

farmworkers from WKI. SJR 82 ("We have relationships with other people that would hire U.S.

workers. If [Mr. Campos] was going to do the same thing [and] I have other people that can do

it, why would I hire him?"). CAB/CEI is therefore liable for the harm caused by these

misstatements because it expected U.S. workers to rely on them.

### B.      AWPA Imposes Direct Liability on Growers Like CAB/CEI

Within their fraud discussions, CAB and CEI direct arguments at three of Plaintiffs' four

AWPA claims. Doc. 185 at 15, Doc. 186 at 13-14.[11]

_____

[11] Nowhere do CAB/CEI seek summary judgment as to Plaintiffs AWPA claim that they violated without
justification the terms of the "working arrangement" made with Plaintiffs in violation of 29 U.S.C. § 1822(c). *See*
Doc. 103 at ¶ 142.b. Congress specifically intended "working arrangement" to be broader than "contract." *See
Antenor v. D & S Farms*, 88 F.3d 925, 933 (11th Cir. 1996) (Congress wrote AWPA broadly to permit farm workers
to protect all those hired by middlemen to perform farm labor.); *De Leon-Granados v. Eller & Sons Trees, Inc.*, 581
F. Supp. 2d 1295, 1324-25 (N.D. Ga. 2008) (The privity requirements of contract law are inapplicable to Plaintiffs'
AWPA claim to enforce a working arrangement.).

CEI argues that because it "farms no land and employs no seasonal farm workers in the production of any crops," it
is not an 'agricultural employer' under 29 U.S.C. § 1802(2) and thus not covered by AWPA. Doc. 186 at 13. But §
1802(2) explicitly applies to "packing sheds" that employ migrant or seasonal workers. CEI employs seasonal
workers in its packing shed. SJR 88. WKI made clear to Dino Cervantes that the workers he hired  would be

First, CAB argues that its lack of direct communication with Plaintiffs and its claimed lack of an agency relationship with WKI prevents Plaintiffs' from proving that CAB knowingly supplied false information regarding the terms of agricultural employment, in violation of 29 U.S.C. § 1821(f).  Doc. 185 at 15.  But the plain text of § 1821(f) broadly encompasses growers who knowingly cause false information to be provided to any farm worker, regardless of the other elements of common-law fraud.  No agency relationship is required, nor is direct communication required.  CAB/CEI violated § 1821(f) by facilitating WKI's H2A application when they had not agreed to pay $9.71 per hour as described above and when they did not intend to accept U.S. workers from WKI.  *See Castillo v. Case Farms of Ohio, Inc.*, 96 F. Supp. 2d 578, 605-06 (W.D. Tex. 1999) (under § 1821(f), grower's knowledge of falsity of representations made to workers by a farm labor contractor may be inferred from all facts and circumstances, including the contractor's inability to comply with promises of free housing and transportation with the $2.50 profit margin allowed by the grower).

Second, CAB/CEI argue that an agency relationship is required before CAB/CEI can be held liable for WKI's use of unregistered labor recruiters under 29 U.S.C. § 1811.  Doc. 185 at 15.  AWPA's text provides otherwise: growers are directly liable for their contractors' use of unregistered recruiters if growers fail to "take reasonable steps" to verify registration of all recruiters.  29 U.S.C. § 1842.  Here, CAB/CEI knew or should have known that WKI had no experience in recruiting any workers for anyone.  SJR 36, 57, 131  Even though WKI made itself available to communicate with Dino Cervantes at any time and was willing to do anything CAB/CEI demanded, CAB/CEI admits that it never attempted to check on WKI's recruiting

housed in a dormitory located in El Paso, Texas and bussed to CAB/CEI each day, rendering the workers migrant or seasonal farmworkers.  SJR 285-87, 296, 298, 316.  CEI is an agricultural employer under 29 U.S.C. § 1802(2).

procedures after signing WKI's form AOS.  SJR 23, 79.  These facts would allow a jury to

conclude that CAB/CEI failed to take reasonable steps to verify registration of WKI's labor

recruiters.

Finally, CAB/CEI claims that an agency relationship is required to hold it liable for

WKI's failure to disclose the terms of employment in writing to all Plaintiffs in their native

language, as required by AWPA, 29 U.S.C. § 1821(a)-(g).  Doc. 185 at 15.  But one of the core

purposes of AWPA was to change prior law to directly impose disclosure requirements on

everyone who "recruits" workers under § 1821(a), including growers.  *See Bueno v. Mattner*, 829

F.2d 1380, 1382 (6th Cir.1987) ("The substantive content of the [now-repealed Farm Labor

Contractor Registration Act] was incorporated into the ... [AWPA], but the new Act went beyond

the old by imposing many of the notice and disclosure duties that had been required only of farm

labor contractors on the agricultural employer.").  "Recruit" in § 1821(a) is read broadly to

include all actions associated with finding workers, including all pre-employment discussions

regarding the workers, and the very "indirect" actions that CAB admits undertaking here.  *See

Escobar v. Baker*, 814 F. Supp. 1491, 1502-03 (W.D. Wash. 1993).  Thus, when CAB/CEI sought

farm workers from WKI, AWPA imposed the disclosure requirements of § 1821(a) directly upon

them regardless of any agency relationship.

## V.     RECORD EVIDENCE PROVES A GENUINE DISPUTE AS TO WHETHER DINO CERVANTES AND JAIME CAMPOS CONSPIRED TO VIOLATE FEDERAL LAW

Conspiracy law protects society from dangers posed by groups, which can cause more

harm and evade detection in ways that individual illegal activity cannot.  *United States v. Feola*,

420 U.S. 671, 693 (1975); *United States v. Greene*, 146 F. 803, 805 (D. Ga. 1906) ("In union

there is strength.").  Unlike criminal conspiracy, however, a civil conspiracy is "not ... actionable

unless a civil action in damages would lie against one of the conspirators." *Ettenson v. Burke*, 17 P.3d 440, 445 (N.M. App. 2000). "The purpose of a civil conspiracy claim is to impute liability to make members of the conspiracy jointly and severally liable for the torts of any of its members." *Id.* The elements of a civil conspiracy claim are: (a) an actionable tort committed by one conspirator; (b) to help carry out an implicit or explicit agreement among two or more persons to accomplish an unlawful objective; (c) which causes damages to the plaintiff. *Id.*

Even if, *arguendo*, CAB/CEI did not directly defraud Plaintiffs as described in Part IV.A., *supra*, the summary judgment record contains ample evidence that Mr. Campos's fraud alone suffices for the first element of CAB/CEI conspiracy liability. Mr. Campos represented directly to Plaintiffs that all work under his H2A application would be first provided to U.S. workers including Plaintiffs, and that the work would pay $9.71 per hour. SJR 142-43, 153-54, 232, 278, 281-87, 404-11. At the time that Mr. Campos made these representations, he had no work available other than that stated in his H2A application. SJR 36-37. Yet the only reason that the growers listed on this H2A application hired WKI was to access Mexican workers, and not U.S. workers like Plaintiffs. SJR 82, 133. Additionally, none of the growers had agreed to pay $9.71 per hour, and Dino Cervantes had no economic incentive to do so. SJR 14, 22-23, 36-37 (WKI had no way to make payroll itself.); SJR 131 (Ronnie Franzoy only agreed to pay minimum wage.); SJR 80 (Dino Cervantes made no wage agreement at all: "wages were never discussed"); SJR 193-94, 199 (CAB/CEI had access to all of the seasonal workers they wanted at minimum wage). Plaintiffs reasonably relied on Mr. Campos's false statements that work was available at $9.71 per hour because TWC helped recruit for the jobs, and the jobs paid much more than Plaintiff's customary minimum wage. SJR 158, 191-94, 199-200, 215, 338-42, 395-96. This is

34

fraud because Mr. Campos should have expected Plaintiffs to rely on his misrepresentations.  *See* RESTATEMENT (SECOND) OF TORTS § 531 comment c (discussed in Part IV.A., *supra*.).

Because the record so plainly shows a dispute as to whether Defendant Campos defrauded Plaintiffs, CAB/CEI seeks summary judgment based only on the second element of conspiracy.  CAB/CEI claim that they are not liable for any fraud committed by Mr. Campos because the record lacks any evidence of a "meeting of the minds" between Dino Cervantes and Jaime Campos to accomplish an unlawful objective.  Doc. 185 at 16-18.[12]  Not so.

"A conspiracy may be established by circumstantial evidence.  Generally, the agreement is a matter of inference from the facts and circumstances.  The question is whether the circumstances, considered as a whole, show the parties united to accomplish the fraudulent scheme."  *State v. Ross*, 521 P.2d 1161, 1163 (N.M. App. 1974) (citations omitted).  "Evidence of a conspiracy will rarely be obvious."  *Pedroza v. Lomas Auto Mall, Inc.*, 600 F. Supp. 2d 1162, 1170 (D.N.M. 2009).  "In civil cases, [summary judgment is only allowed] when the evidence is so one-sided as to leave no room for any reasonable difference of opinion as to how the case should be decided[;] the court must be convinced that the evidence presented is insufficient to support any reasonable inference of a conspiracy."  *Westborough Mall, Inc. v. Cape Girardeau*,

---

[12] CAB and CEI seek Rule 11 sanctions, arguing that Plaintiffs' counsel failed to sufficiently investigate the conspiracy claim prior to stating it.  Doc. 185 at 17-19.  CAB's Rule 11 assertion is "itself frivolous." *See Mulato v. Wells Fargo Bank*, 76 F. Supp. 3d 929, 963 (N.D. Cal. 2014); *see also Craig v. Govt. Employees' Ins. Co*., 134 F.R.D. 126, 127 (D. Md. 1991) ("filing of the Rule 11 motion in this case [was] no more than a distraction of the Court's and counsel's attention from the merits of the cause, and a waste of the Court's time").  CAB/CEI's assertion is frivolous because Plaintiffs support their conspiracy claim with ample evidence to avoid summary judgment, as cited *infra*.  *See Prissert v. EMCORE Corp*., 289 F.R.D. 342, 346 (D.N.M. 2012) (objective reasonableness exists where facts are fairly disputed).  Additionally, CAB/CEI failed to properly file their motion, ignoring the separate-motion requirement and the safe-harbor requirement of Rule 11(c)(2).  Finally, CAB/CEI's motion is meritless even if summary judgment is somehow granted to CAB on Plaintiffs' conspiracy claim.  *See Gibson v. Chrysler Corporation*, 261 F.3d 927, 949 (9th Cir. 2001) ("we recognize the difficulties faced by parties who seek to advance novel legal arguments"); *Mareno v. Rowe*, 910 F.2d 1043, 1047 (2d Cir. 1990) (For "Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands.").

693 F.2d 733, 743 (8th Cir. 1982) (citations omitted).

The record contains ample evidence from which a jury may reasonably conclude that CAB/CEI worked with WKI to obtain Mexican H2A workers despite the availability of U.S. workers and without paying the AEWR of $9.71 per hour, both in violation of federal law.  This evidence includes:

(a) CAB/CEI had access to all of the U.S. seasonal labor that they wanted at all relevant times, SJR 191, 194-97, 199, 201, so federal law prohibited them from directly applying for H2A workers,[13] yet CAB/CEI sought the same labor indirectly through WKI.

(b) CAB/CEI contracted with WKI to obtain only Mexican H2A workers, and not U.S. workers, SJR 79-80, 82, when H2A law strictly requires all available U.S. workers to be hired prior to hiring any foreign workers,  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 596 (1982) (H2A provides U.S. workers a statutory preference); *Vega v. Nourse Farms, Inc*., 62 F. Supp. 2d 334, 341 (D. Mass. 1999) (same).

 (c) CAB/CEI had no rational business reason to work with WKI other than to obtain Mexican H2A workers indirectly, for CAB/CEI are established businesses with access to all of the capital and U.S. labor that they needed without WKI, SJR 85, 199, 217-18, and Doc. 109 at ¶ 5 and Doc. 186 at 2, while WKI was a completely new and untested concern with no assets that had never recruited any workers, had never had an H2A application granted by DOL, and had no

---

[13] *See* 8 U.S.C. 1188(a)(1) ("A petition to import an alien as an H-2A worker ... may not be approved by the Attorney General unless the petitioner has applied to the Secretary of Labor for a certification that--(A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and (B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed."); 20 C.F.R. § 655.103(a) ("In order to bring nonimmigrant workers to the U.S. to perform agricultural work, an employer must first demonstrate to the Secretary that there are not sufficient U.S. workers able, willing, and qualified to perform the work in the area of intended employment at the time needed and that the employment of foreign workers will not adversely affect the wages and working conditions of U.S. workers similarly employed.").

capacity to supervise workers in the fields.  SJR 11-12, 14, 23-25, 36, 57, 93, 131.  *See, e.g., Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 622 F. Supp. 2d 890, 903-04 (N.D. Cal. 2009) (circumstantial evidence of conspiracy includes absence of a rational reason for business decisions).

(d) CAB/CEI paid their U.S. seasonal agricultural workers minimum wage of $7.50 per hour at all relevant times, and never even had to attempt to raise wages to attract U.S. workers, SJR 193-94, 199, so they had no economic incentive to ever pay the higher H2A wage rate of $9.71 per hour.

(e) Even though Dino Cervantes is an experienced businessman, he signed a contract to undertake brand new and quite serious business for CAB/CEI—the importation of foreign workers into the United States.  SJR 78-80, 391-94.  On its face, the contract he signed is drafted so as to fairly create suspicion as whether this document is deliberately evasive:

(i) it conspicuously omits stating what wage rate CAB/CEI would pay workers;

(ii) it conspicuously omits stating how CAB/CEI would compensate WKI for its services;

(iii) it plainly describes CEI's work, and yet does so under CAB's name;

(iv) it lists CAB's name over CEI's separate address and telephone number;

(v) it provides that it is "effective [Date];" and

(vi) while it provides that Jaime Campos signed on behalf of "WKI," it only provides that Dino Cervantes signed on behalf of "Farmer," neither CEI nor CAB.

SJR 225.  Another grower testified that one would have to be "desperate or stupid" to sign this document.  SJR 108; *see also* SJR 41.

37

(f) Evidence shows that another grower working with WKI in an identical fashion to CAB/CEI admitted that WKI's false reason for cancelling the H2A application—a drought—was "a bunch of kahooey," SJR 134, and Mr. Campos claims that he consulted with CAB/CEI concerning his cancellation of the H2A application, SJR 71-72, 273, 377.

(g) CAB/CEI recently made several implausible claims about their dealings with WKI, including—

(i) no one other than Dino Cervantes ever discussed the WKI contract, and Dino Cervantes only did so once on September 10, 2011, Doc. 185-2 at 1, when ample evidence shows a genuine dispute as to whether multiple discussions occurred, SJR 71-72, 77, 88-89, 273;

(ii) Dino Cervantes would have accepted U.S. or non-H2A workers from WKI under the explicit terms of SJR 225, Doc. 185-2 at 2, when he previously testified otherwise, SJR 79-80, 82, and when he had no rational reason for doing so, *see* SJR 193-99 (satisfied with current access to U.S. workers independent of WKI); SJR 11-12, 25, 93, 131 (WKI had no capacity to supervise workers, and no experience in recruiting or supervising any workers ever); SJR 193-94 (CAB paid its U.S. workers minimum wage when an H2A contract would have required U.S. workers to be paid $9.71 per hour); and

(iii) Dino Cervantes did not "hear" from WKI by November 10, 2011 and this alone was enough for him to hire replacement workers, Doc. 185-2 at 3, when any rational person—including any juror—would learn the status of a contract that directly affects the lives of 15 workers for three months prior to abandoning it.

*See Aka v. Wash. Hosp. Center*, 156 F.3d 1284, 1292-93 (D.C. Cir. 1998) ("Events have causes; if

38

the only explanations set forth in the record have been rebutted, the jury is permitted to search

for others, and may in appropriate circumstances draw an inference of [wrongdoing].").[14]

Any one of these items would permit a jury to conclude that a meeting of the minds to

achieve an unlawful end existed.  Plaintiffs submit that a conspiracy could be inferred simply

because Dino Cervantes knew he had access to all of the U.S. workers he needed, and a man

with no experience whatsoever told him that H2A workers could be gotten instead.  SJR 78-80.

Together, all of the evidence cited above should readily prevent summary judgment on Plaintiffs'

conspiracy claim.  "The existence or nonexistence of a conspiracy is essentially a factual issue

that the jury, not the trial judge, should decide."  *Fisher v. Shamburg*, 624 F.2d 156, 162 (10th

Cir. 1980) (*quoting Adickes v. S.H. Kress & Co*., 398 U.S. 144, 176 (1970) (Black, concurring));

*see also Seifert v. Unified Govt. of Wyandotte County/Kansas City*, 779 F.3d 1141, 1160 (10th

Cir. 2015) (finding sufficient evidence of conspiracy); *N. Texas Prod. Credit Ass'n v. McCurain*

*County Nat. Bank*, 222 F.3d 800, 815 (10th Cir. 2000) (same).

Finally, there can be no dispute but that Mr. Campos committed an overt act in

furtherance of the conspiracy.  He admits filing SJR 228-37, which lists CAB/CEI as a fixed-site

employer.  SJR 57.  Mr. Campos then used SJR 281-98 as a job offer presented to Plaintiffs,

which they accepted.  SJR 141-43, 153-54,   A single overt act by any conspirator is sufficient to

establish joint and several liability among all conspirators.  *Ettenson*, 17 P.3d at 445.

---

[14]  *See also Wright v. West*, 505 U.S. 277, 296 (1992) ("if the jury did disbelieve [testimony], it was further entitled
to consider whatever it concluded to be perjured testimony as affirmative evidence of [wrongdoing]"); *Martin v.
Norris*, 82 F.3d 211, 216 (8th Cir. 1996) ("in a case involving a fabricated alibi, 'fabrication of evidence of
innocence is cogent evidence of guilt'").

**CONCLUSION**

The record shows that genuine disputes of fact prevent summary judgment on Plaintiffs claims for AWPA violations, breach of contract (via agency or third-party beneficiary), fraud, and conspiracy.  Therefore, Plaintiffs respectfully request that the Court deny the motions for summary judgment presented by CAB and CEI.

Respectfully submitted,

June 28, 2016

TEXAS RIOGRANDE LEGAL AID, INC.
1331 Texas Ave.
El Paso, TX 79901
(915) 585-5100

*/s/ Jerome Wesevich*
Jerome Wesevich
N.M. Bar No. 20389
Email: jwesevich@trla.org
Christopher Benoit
Texas Bar No. 24068653
Email: cbenoit@trla.org
Admitted to Practice in D.N.M.
ATTORNEYS FOR PLAINTIFFS

CERTIFICATE OF SERVICE

I certify that on the date next to my signature above I electronically filed the foregoing document and all referenced exhibits and attachments using the Court's CM/ECF system, which provides notice and service of these documents to all parties and attorneys of record in the above matter.

*/s/ Jerome Wesevich*